STATE of Minnesota, Respondent,

v.

Gary M. KOLLA, Appellant.

No. A03–55.

Court of Appeals of Minnesota.

Dec. 2, 2003.

**4**

Mike Hatch, Attorney General, David P. Iverson, Assistant Attorney General, St. Paul; and Craig S. Nelson, Freeborn County Attorney, Karyn McBride, Assistant County Attorney, Albert Lea, for respondent.

William G. Peterson, Peterson Law Office, P.A., Bloomington, for appellant.

Considered and decided by HUDSON, Presiding Judge; RANDALL, Judge; and HALBROOKS, Judge.

## O P I N I O N

HALBROOKS, Judge.

Appellant challenges his conviction of six counts of violating Minnesota state game and fish laws relating to the transport of minnows, arguing that (1) he successfully asserted the affirmative defense created by Minn.Stat. § 97A.255, subd. 2(a) (2000), and (2) the minnow-transport laws under which he was charged, Minn.Stat. §§ 97C.501, subd. 4(a)–(b), .515 (2000), discriminate against interstate commerce in violation of the Commerce Clause. We conclude that the affirmative defense asserted by appellant was not available to him. We further conclude that Minn.Stat. §§ 97C.501, subd. 4(b), and .515 are constitutional, and affirm appellant's convictions under those provisions. Because we conclude that Minn.Stat. §§ 97A.475, subd. 28(1), 97C.501, subd. 4(a) (2000) violate the Commerce Clause, we reverse appellant's convictions based on those provisions.

## FACTS

Between 1988 and September 2000, appellant Gary Kolla, an Ohio resident, worked as a truck driver for the Akron Wholesale Bait Farm (Akron Bait), an Ohio business. Appellant's job entailed driving a tractor-trailer fitted with fish-transport tanks from Ohio to baitfish wholesalers in South Dakota, loading the tanks with live minnows, and transporting the minnows back to Ohio. The truck appellant drove had Ohio license plates and a prominent sign on the cab reading "Akron Wholesale Bait Farm."

On August 16, 2000, appellant picked up loads of minnows at two baitfish wholesalers in Brookings, South Dakota, and drove east along Interstate 90 to a rest stop near Hayward, Minnesota. There, he parked next to a minnow-transport truck belonging to the Shell Rock River Fish Farm (Shell Rock), a Hayward baitfish wholesaler. Appellant and Shell Rock owner David Palmer transferred minnows from the Shell Rock truck to appellant's truck. Two Minnesota Department of Natural Resources (DNR) conservation officers observed the transfer. When appellant drove off, one officer followed him east

along Interstate 90 until he entered Wisconsin.

The Minnesota Commissioner of Natural Resources is charged by statute with enforcing those game and fish laws that "prohibit or allow importation, transportation, or possession of a wild animal." Minn. Stat. § 84.027, subd. 13 (2000); *see also* Minn.Stat. § 97A.011 (2000) (stating Minn. Stat. chs. 97A, 97B, 97C (2000) are the "game and fish laws"). Minnows are "[p]rotected wild animals." Minn.Stat. § 97A.015, subd. 39.

Minn.Stat. § 97C.501, subd. 4, provides:

(a) A nonresident may not transport minnows in a motor vehicle without an exporting minnow hauler license.

(b) A nonresident must obtain an exporting minnow hauler's vehicle license for the motor vehicle used to transport minnows.... The license must be conspicuously displayed in the vehicle.

(c) Only one nonresident motor vehicle license may be issued to an exporting minnow hauler.

Minn.Stat. § 97C.515 provides:

Subdivision 1. General prohibition. A person may not bring live minnows into the state except as provided in this section.

Subd. 2. Permit for transportation. A person may transport minnows through the state with a permit from the commissioner. The permit must state the name and address of the person, the number and species of minnows, the point of entry into the state, the destination, and the route through the state. The permit is not valid for more than 12 hours after it is issued.

"To transport" means "[to] caus[e] ... wild animals to be carried or moved by a device and includes accepting or receiving wild animals for transportation or shipment." Minn.Stat. § 97A.015, subd. 48.

Upon investigation, the conservation officer who followed appellant to the Wisconsin border on August 16 discovered that neither appellant nor Akron Bait held any licenses or permits to transport minnows in Minnesota. The DNR took no action.

On September 27, 2000, appellant again loaded minnows into his truck at two baitfish wholesalers in Brookings and drove to the Shell Rock facility in Hayward, where he and David Palmer transferred minnows from the Shell Rock holding tanks into his own truck. Again, a DNR conservation officer observed this transfer. When appellant drove off, the conservation officer stopped him for failing to display an exporting minnow-hauler's vehicle license. The officer arrested appellant after learning that he did not possess any licenses or permits to transport minnows in or through Minnesota.

On the basis of appellant's August 16 and September 27 activity, the DNR charged him with two counts of failing to obtain an exporting minnow-hauler's license, Minn.Stat. § 97C.501, subd. 4(a); two counts of failing to obtain an exporting minnow-hauler's vehicle license, Minn.Stat. § 97C.501, subd. 4(b); and two counts of failing to obtain a 12-hour permit to transport minnows through the state, Minn. Stat. § 97C.515, subd. 2. Appellant pleaded not guilty.

Before trial, appellant filed a motion to dismiss the complaint, arguing that the minnows he transported were "private aquatic life" as defined by Minn.Stat. § 17.47, subd. 7 (2000), and not "wild animals of the state" subject to regulation by the Commissioner of Natural Resources. Minn.Stat. § 84.027, subd. 2 (2000); *see also* Minn.Stat. § 97A.255, subd. 2(a) (establishing affirmative defense to prosecution that alleges transportation of minnows in violation of game and fish laws where

the defendant can show the animals in question were "raised in a private fish hatchery or aquatic farm"). Appellant also argued that dismissal was warranted because Minnesota's nonresident minnow-transport license fees impermissibly discriminate against interstate commerce, in violation of the Commerce Clause. The district court denied the motion.

At trial, Palmer testified that the minnows appellant took on from the Shell Rock truck and holding tanks in Hayward, Minnesota had been trapped in South Dakota by Palmer's sons, who operate a bait-fish wholesale operation in Brookings, and transported by Palmer to Minnesota. Palmer further testified to his belief that the minnows his sons trap are not bred, but occur naturally in waters leased by his sons on private property in South Dakota. Appellant's attorney subsequently summarized Palmer's testimony as stating that "all of the minnows that we are talking about here were ... raised on aquatic farms in South Dakota." There was no objection to this characterization of Palmer's testimony. A South Dakota State Department of Game, Fish, and Parks officer testified that both South Dakota baitfish wholesalers from whom appellant obtained minnows trap their fish in leased wetlands, ponds, and lakes in southeastern South Dakota.

The district court found appellant guilty as charged and imposed a 30–day stayed sentence, one year of probation, and a $950 fine. This appeal follows.

## ISSUES

1. Did appellant successfully assert the affirmative defense created by Minn. Stat. § 97A.255, subd. 2(a) (2000)?

2. Do Minn.Stat. §§ 97A.475, subd. 28(1), 97C.501, subd. 4(a) (2000), regulating minnow transport by nonresidents, discriminate against interstate commerce in violation of the Commerce Clause?

## ANALYSIS

### I.

Appellant argues that the charges against him are defeated by his assertion of the affirmative defense set forth in Minn.Stat. § 97A.255, subd. 2(a) (2000), which provides:

> In a prosecution that alleges animals have been ... transported, or possessed in violation of the game and fish laws, the burden of establishing that the animals were domesticated, reared in a private preserve, raised in a private fish hatchery or aquatic farm ... is on the defendant.

The parties agree that this provision, if applicable, provides an affirmative defense to charges brought pursuant to Minn.Stat. ch. 97C (2000). They also agree that all of the minnows in appellant's truck on August 16 and September 27, 2000, came from South Dakota waters that were not subject to any licensing or regulatory scheme created or enforced by the Minnesota Commissioner of Natural Resources. The only issue is whether those waters were "aquatic farms" within the meaning of Minn.Stat. § 97A.255, subd. 2(a), such that appellant could successfully avail himself of the affirmative defense.

The interpretation of statutes and their application to undisputed facts present questions of law, which we review de novo. *Rockford Township v. City of Rockford*, 608 N.W.2d 903, 905 (Minn.App. 2000). Minn.Stat. chs. 97A, 97B, 97C (2000) (the "game and fish laws"), do not define "aquatic farm." Elsewhere in the Minnesota statutes, the Aquaculture Development Act (ADA), Minn.Stat. § 17.46– .4999 (2000), defines an aquatic farm as

a facility used for the purpose of culturing private aquatic life in waters, including but not limited to artificial ponds, vats, tanks, raceways, other indoor or outdoor facilities that an aquatic farmer owns or [that] an aquatic farmer has exclusive control of, or private fish hatcheries licensed under section 97C.211 for the sole purpose of processing or cultivating aquatic life.

Minn.Stat. § 17.47, subd. 3. "A person or entity may not operate an aquatic farm without first obtaining an aquatic farm license from the commissioner [of Natural Resources]." Minn.Stat. §§ 17.4984, subd. 1(a), .4982, subd. 7.

At trial, appellant asserted that the minnows he possessed originated in "aquatic farms," as defined by the ADA and were therefore "private aquatic life" beyond the scope of the commissioner's authority, which is limited to the execution and enforcement of "laws relating to wild animals." Minn.Stat. § 97A.201, subd. 1. The district court rejected this argument after concluding that the South Dakota waters in which the minnows originated were not, and could not be, licensed by the Minnesota commissioner to operate as aquatic farms pursuant to the ADA.

Appellant now abandons any reliance on the ADA's definitions of "aquatic farm" or "private aquatic life" in asserting the affirmative defense set forth in Minn.Stat. § 97A.255, subd. 2(a). Instead, he relies on a South Dakota statute that provides that "[f]ish grown or raised for breeding purposes or sale [are] agricultural products" to argue that the minnows he possessed were "agricultural products" and not wild animals susceptible to regulation under Minnesota game and fish laws. S.D. Codified Laws § 41–1–7 (Michie 2000). We disagree.

■ We first observe that arguments not presented to the district court are generally waived on appeal. *See Thiele v. Stich,* 425 N.W.2d 580, 582 (Minn.1988) (stating party may not, on appeal, switch to a new theory on an issue). Second, we disagree with appellant's contention that application of the ADA's definition of "aquatic farm" to the term as it appears in the game and fish laws cannot be justified by the doctrine of in pari materia or any other canon of statutory construction.

■ "Statutes 'in pari materia' are those relating to the same person or thing or having a common purpose." *Apple Valley Red–E–Mix, Inc. v. State by Dep't of Pub. Safety,* 352 N.W.2d 402, 404 (Minn.1984). Such statutes should be construed in light of one another. *Id.* The game and fish laws empower the Commissioner of Natural Resources to enforce regulations that preserve and protect aquatic wildlife. Minn.Stat. § 97A.045, subd. 1. The ADA empowers the commissioner to regulate cultured private aquatic life, which is "not wildlife." Minn.Stat. § 17.4981. Minnows are defined as wild animals pursuant to the game and fish laws except when the circumstances under which they are cultivated bring them within the ADA's definition of aquaculture. These two statutes complement each other and together serve a common purpose: to regulate and protect Minnesota's waters and aquatic life, both public and private.

■ We therefore conclude that the ADA and the game and fish laws should be construed in light of one another and that the ADA's definition of "aquatic farm," requiring a license from the Minnesota commissioner, is therefore applicable to the term as it appears in the affirmative defense asserted by appellant. Because it is undisputed that none of the minnows in appellant's possession came from waters licensed as aquatic farms by the Minnesota

commissioner, the affirmative defense is not available to appellant here.

■ We further observe that, in light of the evidence presented at trial, our conclusion would be the same even were we to disregard the ADA's definition of "aquatic farm" in favor of the common definition of the term "farm" as applied to aquaculture, which is "[a]n area of water devoted to the raising, breeding, or production of a specific aquatic animal." *American Heritage Dictionary of the English Language* 661 (3d ed. 1992). The evidence presented demonstrated that the fish appellant possessed were neither raised, bred, nor produced, but occurred naturally in South Dakota waters. Although appellant relies on a statement made by his attorney at trial, and not contradicted at the time, that the South Dakota waters were "aquatic farms," that statement was not testimony, was contradicted by all other testimony, and was not credited by the district court.

## II.

■ Appellant argues that the Minnesota minnow-transport laws under which he was charged discriminate against interstate commerce in violation of the Commerce Clause, U.S. Const. art. I, § 8, cl. 3. This court reviews the constitutionality of a statute de novo. *State v. Grossman,* 636 N.W.2d 545, 548 (Minn.2001). "Statutes are presumed constitutional." *Id.* The party challenging the statute must show, beyond a reasonable doubt, that the statute violates the constitution. *Id.*

■ "Commerce Clause challenges involve a two-step inquiry. We first determine whether the challenged statute implicates the Commerce Clause and, if it does, then evaluate whether the statute violates the Commerce Clause." *Chapman v. Comm'r of Revenue,* 651 N.W.2d 825, 832 (Minn.2002) (citation omitted).

■ Appellant was charged with two counts of failing to obtain a 12–hour permit to transport minnows through the state, Minn.Stat. § 97C.515, subd. 2, two counts of failing to obtain a nonresident exporting minnow-hauler's vehicle license, Minn.Stat. § 97C.501, subd. 4(b), and two counts of failing to obtain a nonresident exporting minnow-hauler's license, Minn.Stat. § 97C.501, subd. 4(a). It is undisputed here that the activity giving rise to the charges against appellant—the commercial transport of minnows within and out of the state—fall within the purview of the Commerce Clause. We note that differential treatment of residents and nonresidents can only implicate the Commerce Clause where the treatment concerns commercial livelihood and the transport of articles of commerce, as opposed to animals taken for sport or recreation. *Compare Hughes v. Oklahoma,* 441 U.S. 322, 338–39, 99 S.Ct. 1727, 1737–38, 60 L.Ed.2d 250 (1979) (stating Oklahoma statute regulating minnow transport implicated Commerce Clause where the minnows were articles of commerce), *with Terk v. Ruch,* 655 F.Supp. 205, 215 (D.Colo.1987) (stating Commerce Clause not implicated by regulation pertaining to sheep and goat hunting because sheep and goat hunting is purely for sport, and not commerce).

We must therefore determine whether those provisions of the game and fish laws under which appellant was convicted violate the Commerce Clause. The Commerce Clause provides that "[t]he Congress shall have Power ... [t]o regulate Commerce ... among the several States." U.S. Const. art. I, § 8, cl. 3. "Though phrased as a grant of regulatory power to Congress, the Clause has long been understood to have a 'negative' aspect that denies the States the power unjustifiably to discriminate against or burden the interstate flow of articles of commerce." *Ore-*

*gon Waste Sys., Inc. v. Dep't of Envtl. Quality,* 511 U.S. 93, 98, 114 S.Ct. 1345, 1349, 128 L.Ed.2d 13 (1994); *see also Caterpillar, Inc. v. C.I.R.,* 568 N.W.2d 695, 698 (Minn.1997) (stating negative, or dormant, Commerce Clause "prohibits states from discriminating against foreign trade even where Congress has failed to legislate on the subject.").

■ Under the dormant Commerce Clause, the term "discrimination" means "differential treatment of in-state and out-of-state economic interests that benefits the former and burdens the latter." *Oregon Waste,* 511 U.S. at 99, 114 S.Ct. at 1350; *see also Chemical Waste Mgmt., Inc. v. Hunt,* 504 U.S. 334, 342, 112 S.Ct. 2009, 2014, 119 L.Ed.2d 121 (1992) (stating a law is discriminatory if it "tax[es] a transaction or incident more heavily when it crosses state lines than when it occurs entirely within the State" (quotation omitted)); *New Energy Co. of Indiana v. Limbach,* 486 U.S. 269, 273–274, 108 S.Ct. 1803, 1807, 100 L.Ed.2d 302 (1988) (stating "[t]his 'negative' aspect of the Commerce Clause prohibits economic protectionism").

■ Nondiscriminatory regulations that have only incidental effects on interstate commerce are valid unless "the burden imposed on such commerce is clearly excessive in relation to the putative local benefits." *Pike v. Bruce Church, Inc.,* 397 U.S. 137, 142, 90 S.Ct. 844, 847, 25 L.Ed.2d 174 (1970). By contrast, a "statute [that] facially discriminates against interstate commerce . . . is all but per se invalid." *Camps Newfound/Owatonna, Inc. v. Town of Harrison, Me.,* 520 U.S. 564, 581, 117 S.Ct. 1590, 1601, 137 L.Ed.2d 852 (1997). However, a state may justify such a restriction "by demonstrating that it advances a legitimate local purpose that cannot be adequately served by reasonable nondiscriminatory alternatives." *Id.* (quotation omitted).

■ Neither the 12–hour permit, which is available free of charge to any "person," nor the vehicle license, which is available to residents and nonresidents for the same fee, is facially discriminatory. *See* Minn.Stat. §§ 97A.475, subd. 26(4) (resident vehicle license fee), 97A.475, subd. 28(2) (nonresident vehicle license fee), and 97C.515, subd. 2 (12–hour permit). There is ample and undisputed evidence in the record of the state's strong interest in regulating the transport of minnows in order to prevent the release of nonindigenous species and disease pathogens into public waters and to protect existing natural aquatic habitats and the wildlife dependent on them. *See, e.g.,* Minn.Stat. § 17.4984. There is also evidence that the state can effectively advance this interest by monitoring individuals who transport minnows within the state.

Given that the state's interest is a legitimate one and that the statutory provision properly advances that interest, in order to invalidate the statute, this court would have to conclude that the putative local benefit is clearly outweighed by the burden upon interstate commerce. *See Pike,* 397 U.S. at 142, 90 S.Ct. at 847. With respect to the 12–hour permit and the nonresident vehicle license fee, that is not the case. Appellant has not shown that the burden imposed on interstate commerce by these provisions is more than minimal, while the demonstrated benefit to the state is significant. We therefore conclude that Minn.Stat. §§ 97C.501, subd. 4(b), and .515, subd. 2, are constitutional.

■ Appellant was also charged with two counts of transporting and exporting minnows without first obtaining a $675 nonresident exporting minnow-hauler's license, in violation of Minn.Stat. § 97C.501, subd. 4(a). *See* Minn.Stat. § 97A.475,

subd. 28(1) (setting fee). A Minnesota resident wishing to legally engage in identical activity must first obtain a $100 minnow-dealer's license (for transport within the state) and a $350 exporting minnow-dealer's license (for transport out of the state). Minn.Stat. §§ 97A.475, subd. 26(1), (3), 97C.501, subd. 2(a). A "minnow dealer" is defined as "a person taking minnows for sale, buying minnows for resale, selling minnows at wholesale, or transporting minnows for sale." Minn.Stat. § 97A.015, subd. 30. In this context, "[t]o transport" means "[to] caus[e] . . . [minnows] to be carried or moved by a device and includes accepting or receiving [minnows] for transportation or shipment." Minn.Stat. § 97A.015, subd. 48.

The statute refers to a resident transporting minnows within the state as a "minnow dealer," Minn.Stat. § 97C.501, subd. 2, a resident exporting minnows out of the state as an "exporting minnow dealer," Minn.Stat. § 97C.501, subd. 2(c), and a nonresident transporting minnows both within and out of the state as an "exporting minnow hauler." Minn.Stat. § 97C.501, subd. 4(a).

Appellant argues that the requirement that he obtain a $675 license to transport and export minnows, while the analogous licenses cost residents a total of $450, discriminates against interstate commerce in violation of the Commerce Clause. We agree.

■ On their face, Minn.Stat. §§ 97A.475, subd. 28(1), 97C.501, subd. 4(a), impose a differential charge favoring resident baitfish transporters over their nonresident counterparts. *See* Minn.Stat. § 97A.475, subd. 28 (setting resident minnow-transport fees). Those provisions are therefore discriminatory and per se invalid unless respondent demonstrates that they "advance[ ] a legitimate local purpose that cannot be adequately served by reasonable nondiscriminatory alternatives." *Oregon Waste*, 511 U.S. at 100–01, 114 S.Ct. at 1351 (quotations omitted). "This is an extremely difficult burden, so heavy that facial discrimination by itself may be a fatal defect." *Camps Newfound*, 520 U.S. at 582, 117 S.Ct. at 1601 (quotations omitted).

■ Respondent first argues that because resident transporters must also purchase licenses, the provisions are not facially discriminatory, and the more lenient *Pike* balancing test provides the proper legal standard. We disagree. Although the state's right to impose a license requirement on resident and nonresident baitfish transporters is not in dispute, any scheme that imposes a surcharge based on geographic distinctions is patently discriminatory. Nor do we agree with respondent's argument that its concededly strong interest in protecting its waters and fisheries by regulating baitfish transport and export precludes a finding that the provisions are discriminatory. "[T]he purpose of, or justification for, a law has no bearing on whether it is facially discriminatory." *Oregon Waste*, 511 U.S. at 100, 114 S.Ct. at 1350; *see also City of Philadelphia v. New Jersey*, 437 U.S. 617, 626, 98 S.Ct. 2531, 2536, 57 L.Ed.2d 475 (1978) (stating the legislature's purpose in enacting a discriminatory regulation is "not . . . relevant" to the determination of whether the regulation violates the Commerce Clause).

■ Respondent next argues that, despite its facial discrimination, the nonresident minnow-transport provisions do not violate the Commerce Clause because the difference between the price for resident and nonresident licenses is so minimal that it cannot be considered discriminatory. But "the degree of a differential burden or charge on interstate commerce 'measures only the *extent* of the discrimination' and 'is of no relevance to the determination

whether a State has discriminated against interstate commerce.'" *Oregon Waste,* 511 U.S. at 100 n. 4, 114 S.Ct. at 1350 n. 4 (alteration in original) (quoting *Wyoming v. Oklahoma,* 502 U.S. 437, 455, 112 S.Ct. 789, 801, 117 L.Ed.2d 1 (1992)); *see also Maryland v. Louisiana,* 451 U.S. 725, 760, 101 S.Ct. 2114, 2136, 68 L.Ed.2d 576 (1981) ("We need not know how unequal [a][t]ax is before concluding that it ... discriminates."). The Minnesota Supreme Court has held that

> for purposes of a discrimination claim under the Commerce Clause the magnitude and scope of the discrimination against interstate commerce have no bearing on the question of whether the Commerce Clause has been violated. In other words, there is no de minimis defense to this type of Commerce Clause challenge.

*Chapman,* 651 N.W.2d at 833 (citing *Camps Newfound,* 520 U.S. at 581 n. 15, 117 S.Ct. at 1601 n. 15).

■ Finally, respondent cites to *Oregon Waste* for the proposition that "a facially discriminatory tax that imposes on interstate commerce the rough equivalent of an identifiable and 'substantially similar' tax on intrastate commerce does not offend the negative Commerce Clause." *See Oregon Waste,* 511 U.S. at 102–03, 114 S.Ct. at 1352. Respondent contends that the surcharge on nonresident minnow transporters is a permissible "compensatory tax" necessary to offset costs incurred by Minnesota in regulating nonresident transporters. *See id.* at 102, 114 S.Ct. at 1351 (recognizing "the settled principle that interstate commerce may be made to pay its way" (quotation omitted)). We disagree. It is true that a facially discriminatory surcharge can be considered a permissible compensatory tax if the state can (1) identify the intrastate tax burden for which it is attempting to compensate and

(2) show that the tax on interstate commerce "approximate[s]—but [does] not exceed—the amount of the tax on intrastate commerce." *Id.* at 103, 114 S.Ct. at 1352. Here, Minnesota imposes a $675 fee on nonresident minnow haulers without imposing an approximately equal or greater fee on residents for which the nonresident fee might be considered compensatory. The only analogous charge to the nonresident surcharge here is the $450 charge imposed on resident minnow haulers. "Respondents' failure to identify a specific charge on intrastate commerce equal to or exceeding the surcharge is fatal to their [compensatory-tax] claim." *Id.* at 104, 114 S.Ct. at 1352.

It is undisputed that respondent has an important interest in protecting its indigenous wildlife and aquaculture from exotic species and pathogens. "But whatever [the regulation's] ultimate purpose, it may not be accompanied by discriminating against [minnow transporters] coming from outside the State unless there is some reason, apart from their origin, to treat them differently." *City of Philadelphia,* 437 U.S. at 626–27, 98 S.Ct. at 2537; *see also Maine v. Taylor,* 477 U.S. 131, 149 n. 19, 106 S.Ct. 2440, 2453 n. 19, 91 L.Ed.2d 110 (1986) (stating "laws that respond to legitimate local concerns by discriminating arbitrarily against interstate trade" are not made valid by their beneficent purpose).

Respondent has presented no evidence that nonresidents who transport minnows pose a greater threat to the state's waters and aquatic species, or are more expensive to regulate, than residents engaged in the same activities. Nor has respondent demonstrated any nexus between the surcharge and the actual costs incurred in the course of regulating nonresident minnow transport. We are therefore unable to conclude that the additional fee is based on

anything other than the nonresidency of the individual transporting the minnows.

Minn.Stat. §§ 97A.475, subd. 28(1), 97C.501, subd. 4(a), facially discriminate against interstate commerce by requiring nonresidents to pay greater license fees than residents to transport minnows within and out of the state. Because respondent has not validly defended the nonresident surcharge by a valid factor unrelated to economic protectionism, we must conclude that these provisions violate the Commerce Clause.

 "When a court determines that a statute is unconstitutional, it must invalidate as much of the statute as is necessary to eliminate the unconstitutionality." *Chapman*, 651 N.W.2d at 836. A court that alters a statute by striking provisions must act consistent with the intent of the legislature that drafted the statute. *Id.*

 Minn.Stat. § 645.20 (2000) provides:

Unless there is a provision in the law that the provisions shall not be severable, the provisions of all laws shall be severable. If any provision of a law is found to be unconstitutional and void, the remaining provisions of the law shall remain valid, unless the court finds the valid provisions of the law are so essentially and inseparably connected with, and so dependent upon, the void provisions that the court cannot presume the legislature would have enacted the remaining valid provisions without the void one; or unless the court finds the remaining valid provisions, standing alone, are incomplete and are incapable of being executed in accordance with the legislative intent.

The game and fish laws do not provide that its provisions are not severable. Although this court can strike severable provisions as unconstitutional, it "cannot add language to a statute in order to render it constitutionally permissible." *McGuire v. C & L Restaurant Inc.*, 346 N.W.2d 605, 614 (Minn.1984).

Minn.Stat. § 97C.501 creates a general rule that a "person" who transports minnows within the state must obtain a minnow-dealer's license and a minnow-dealer's vehicle license and that a minnow dealer who transports minnows out of the state must obtain an exporting minnow-dealer's license and an exporting minnow-dealer's vehicle license. Minn.Stat. § 97C.501, subd. 2(b)-(c). The statute creates an exception to this general rule by requiring that nonresidents obtain an exporting minnow-hauler's license to transport minnows within and out of the state. Minn.Stat. § 97C.501, subd. 4(a); *see also* Minn.Stat. § 97A.475, subd. 28(1) (establishing nonresident license fees).

 The exception to the general rule is the source of the statute's constitutional infirmity, which can be cured consistent with the severance rules by striking Minn. Stat. § 97C.501, subd. 4(a), so as to eliminate the exporting minnow-hauler's license altogether; we further strike the attendant fee provision, Minn.Stat. § 97A.475, subd. 28(1).

Henceforth, nonresidents and residents desiring to transport minnows within and out of Minnesota will obtain the same minnow-dealer's license currently required of all "persons" pursuant to Minn.Stat. § 97C.501, subd. 2, and will pay the license fee established for minnow dealers by Minn.Stat. § 97A.475, subd. 26. Nonresidents will continue to obtain the exporting minnow-hauler's license described in Minn. Stat. § 97C.501, subd. 4(b). We believe this licensing scheme will preserve the legislature's intent to protect Minnesota's aquaculture and wildlife without discriminating against interstate commerce. We therefore reverse appellant's convictions

for failing to obtain the license required by Minn.Stat. § 97C.501, subd. 4(a).

## DECISION

The district court did not err by concluding that appellant had no grounds upon which to assert the affirmative defense set forth in Minn.Stat. § 97A.255, subd 2(a) (2000).

Because the 12–hour permit required of all persons to transport minnows through the state pursuant to Minn.Stat. § 97C.515, subd. 2 (2000), is constitutional, and because appellant failed to obtain such a permit, the convictions arising from his violations of that statute are affirmed. Because the provision requiring an exporting minnow-hauler's vehicle license, Minn.Stat. § 97C.501, subd. 4(b) (2000), is constitutional, and because appellant failed to obtain such a license, the convictions arising from his violations of that statute are affirmed.

By imposing a differential license fee that favors resident minnow haulers and exporters over their nonresident counterparts, Minn.Stat. §§ 97A.475, subd. 28(1), 97C.501, subd. 4(a) (2000) discriminate against interstate commerce in violation of the Commerce Clause. We therefore sever those subdivisions from the remainder of the statute, with the result that nonresidents and residents alike will henceforth obtain minnow-dealer's licenses pursuant to Minn.Stat. § 97C.501, subd. 2 (2000). As to the two convictions arising from appellant's violations of Minn.Stat. § 97C.501, subd. 4(a), the judgment of the district court is reversed.

**Affirmed in part and reversed in part.**