**FOR PUBLICATION**

UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

| | |
|---|---|
| ARIZONA DREAM ACT COALITION; CHRISTIAN JACOBO; ALEJANDRA LOPEZ; ARIEL MARTINEZ; NATALIA PEREZ-GALLEGOS; CARLA CHAVARRIA; JOSE RICARDO HINOJOS, | No. 15-15307 |
| | D.C. No. 2:12-cv-02546-DGC |
| Plaintiffs - Appellees, | |
| | OPINION |
| v. | |
| JANICE K. BREWER, Governor of the State of Arizona, in her official capacity; JOHN S. HALIKOWSKI, Director of the Arizona Department of Transportation, in his official capacity; STACEY K. STANTON, Assistant Director of the Motor Vehicle Division of the Arizona Department of Transportation, in her official capacity, | |
| Defendants - Appellants. | |

Appeal from the United States District Court
for the District of Arizona
David G. Campbell, District Judge, Presiding

Argued and Submitted July 16, 2015
Pasadena, California

Before: Harry Pregerson, Marsha S. Berzon, and Morgan B. Christen, Circuit Judges.

Opinion by Judge Harry Pregerson, Circuit Judge:

Plaintiffs are five individual recipients of deferred action under the Deferred Action for Childhood Arrivals ("DACA") program, and the Arizona DREAM Act Coalition ("ADAC"), an organization that advances the interests of young immigrants. DACA recipients are noncitizens who were brought to this country as children. Under the DACA program, they are permitted to remain in the United States for some period of time as long as they meet certain conditions. Authorized by federal executive order, the DACA program is administered by the Department of Homeland Security and is consistent with the Supreme Court's ruling that the federal government "has broad, undoubted power over the subject of immigration and the status of aliens" under the Constitution. *Arizona v. United States*, 132 S. Ct. 2492, 2498 (2012).

In response to the creation of the DACA program, Defendants—the Governor of the State of Arizona; the Arizona Department of Transportation ("ADOT") Director; and the Assistant Director of the Motor Vehicle Division—instituted a policy that rejected the Employment Authorization Documents ("EADs") issued to DACA recipients under the DACA program as

proof of authorized presence for the purpose of obtaining a driver's license. Plaintiffs seek permanently to enjoin Defendants from categorically denying drivers' licenses to DACA recipients. The district court ruled that Arizona's policy was not rationally related to a legitimate government purpose and thus violated the Equal Protection Clause of the Fourteenth Amendment. The district court granted Plaintiffs' motion for summary judgment and entered a permanent injunction. Defendants appealed.

We agree with the district court that DACA recipients are similarly situated to other groups of noncitizens Arizona deems eligible for drivers' licenses. As a result, Arizona's disparate treatment of DACA recipients may well violate the Equal Protection Clause, as our previous opinion indicated is likely the case. *Arizona Dream Act Coalition v. Brewer*, 757 F.3d 1053 (9th Cir. 2014). The district court relied on this ground when it issued the permanent injunction. Applying the principle of constitutional avoidance, however, we need not and should not come to rest on the Equal Protection issue, even if it "is a plausible, and quite possibly meritorious" claim for Plaintiffs, so long as there is a viable alternate, nonconstitutional ground to reach the same result. *Overstreet v. United Bhd. of Carpenters & Joiners of Am., Local Union No. 1506*, 409 F.3d 1199, 1211

3

(9th Cir. 2005) (citing *Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. &*

*Constr. Trades Council*, 485 U.S. 568, 576–78 (1988)).

We conclude that there is. Arizona's policy classifies noncitizens based on

Arizona's independent definition of "authorized presence," classification authority

denied the states under the Immigration and Nationality Act ("INA"), 8 U.S.C. §

1101, *et seq*. We therefore affirm the district court's order that Arizona's policy is

preempted by the exclusive authority of the federal government to classify

noncitizens.

## FACTUAL BACKGROUND

### I. The DACA Program

On June 15, 2012, the Department of Homeland Security announced the

DACA program pursuant to the DACA Memorandum. Under the DACA program,

the Department of Homeland Security exercises its prosecutorial discretion not to

seek removal of certain young immigrants. The DACA program allows these

young immigrants, including members of ADAC, to remain in the United States

for some period of time as long as they meet specified conditions.

To qualify for the DACA program, immigrants must have come to the

United States before the age of sixteen and must have been under the age of thirty-

one by June 15, 2012. *See* Memorandum from Secretary Janet Napolitano,

Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children (June 15, 2012). They must have been living in the United States at the time the DACA program was announced and must have continuously resided here for at least the previous five years. *Id.* Additionally, DACA-eligible immigrants must be enrolled in school, have graduated from high school, have obtained a General Educational Development certification, or have been honorably discharged from the U.S. Armed Forces or Coast Guard. *Id.* They must not pose a threat to public safety and must undergo extensive criminal background checks. *Id.*

If granted deferred action under DACA, immigrants may remain in the United States for renewable two-year periods. DACA recipients enjoy no formal immigration status, but the Department of Homeland Security does not consider them to be unlawfully present in the United States and allows them to receive federal EADs.

**II. Arizona's Executive Order**

On August 15, 2012, the Governor of Arizona issued Arizona Executive Order 2012–06 ("Arizona Executive Order"). Executive Order 2012–06, "Re-Affirming Intent of Arizona Law In Response to the Federal Government's Deferred Action Program" (Aug. 15, 2012). A clear response to DACA, the

Arizona Executive Order states that "the Deferred Action program does not and cannot confer lawful or authorized status or presence upon the unlawful alien applicants." *Id.* at 1. The Arizona Executive Order announced that "[t]he issuance of Deferred Action or Deferred Action USCIS employment authorization documents to unlawfully present aliens does not confer upon them any lawful or authorized status and does not entitle them to any additional public benefit." *Id.* The Order directed Arizona state agencies, including ADOT, to "initiate operational, policy, rule and statutory changes necessary to prevent Deferred Action recipients from obtaining eligibility, beyond those available to any person regardless of lawful status, for any taxpayer-funded public benefits and state identification, including a driver's license." *Id.*

## III. Arizona's Driver's License Policy

To implement the Arizona Executive Order, officials at ADOT and its Motor Vehicle Division initiated changes to Arizona's policy for issuing drivers' licenses. Under Arizona state law, applicants can receive a driver's license only if they can "submit proof satisfactory to the department that the applicant's presence in the United States is authorized under federal law." Ariz. Rev. Stat. Ann. § 28–3153(D). Prior to the Arizona Executive Order, ADOT Policy 16.1.2 included all federally issued EADs as "proof satisfactory" that an applicant's

presence was "authorized under federal law." The Motor Vehicle Division therefore issued drivers' licenses to all individuals with such documentation.

After the Arizona Executive Order, the Motor Vehicle Division announced that it would not accept EADs issued to DACA recipients—coded by the Department of Homeland Security as (c)(33)—as proof that their presence in the United States is "authorized under federal law." The Motor Vehicle Division continued to accept federally issued EADs from all other noncitizens as proof of their lawful presence, including individuals who received deferred action outside of the DACA program and applicants coded (c)(9) (individuals who have applied for adjustment of status), and (c)(10) (individuals who have applied for cancellation of removal).

In 2013, ADOT revised its policy again. Explaining this change, ADOT Director John S. Halikowski testified that Arizona views an EAD as proof of presence authorized under federal law only if the EAD demonstrates: (1) the applicant has formal immigration status; (2) the applicant is on a path to obtaining formal immigration status; or (3) the relief sought or obtained is expressly provided pursuant to the INA. Using these criteria, ADOT began to refuse driver's license applications that relied on EADs, not only from DACA recipients, but also from beneficiaries of general deferred action and deferred enforced departure. It

continued to accept as proof of authorized presence for purposes of obtaining drivers' licenses EADs from applicants with (c)(9) and (c)(10) status. We refer to the policy that refuses EADs from DACA recipients as "Arizona's policy."

## IV. Preliminary Injunction

On November 29, 2012, Plaintiffs sued Defendants in federal district court, alleging that Arizona's policy of denying drivers' licenses to DACA recipients violates the Equal Protection Clause and the Supremacy Clause of the U.S. Constitution. Plaintiffs sought declaratory relief and a preliminary injunction prohibiting Defendants from enforcing their policy against DACA recipients. On May 16, 2013, the district court ruled that Arizona's policy likely violated the Equal Protection Clause but it declined to grant the preliminary injunction because Plaintiffs had not shown irreparable harm. *ADAC v. Brewer*, 945 F. Supp. 2d 1049 (D. Ariz. 2013) ("*ADAC I*"), *reversed by ADAC v. Brewer*, 757 F.3d 1053 (9th Cir. 2014) ("*ADAC II*"). It also granted Defendants' motion to dismiss the Supremacy Clause claim. *Id.* at 1077–78. Plaintiffs appealed the district court's denial of a preliminary injunction.

## V. Permanent Injunction

While Plaintiffs' appeal of the preliminary injunction ruling was pending, Plaintiffs sought a permanent injunction in district court on Equal Protection

grounds and moved for summary judgment. Defendants also moved for summary judgment, arguing that DACA recipients are not similarly situated to other noncitizens who are eligible for drivers' licenses under Arizona's policy.

We reversed the district court's decision on the motion for preliminary injunction, agreeing with the district court that Arizona's policy likely violated the Equal Protection Clause and holding that Plaintiffs had established that they would suffer irreparable harm as a result of its enforcement. *See ADAC II*, 757 F.3d at 1064. In a concurring opinion, one member of our panel concluded that Plaintiffs also demonstrated a likelihood of success on their claim that Arizona's policy was preempted. *Id.* at 1069 (Christen, J., concurring). On January 22, 2015, the district court granted Plaintiffs' motion for summary judgment and entered a permanent injunction. *ADAC v. Brewer*, 81 F. Supp. 3d 795 (D. Ariz. 2015) ("*ADAC III*"). We affirm the district court's order.

## STANDARD OF REVIEW

We review the district court's grant or denial of motions for summary judgment *de novo*. *Besinga v. United States*, 14 F.3d 1356, 1359 (9th Cir. 1994). We determine whether there are any genuine issues of material fact and review the district court's application of substantive law. *Gerhart v. Lake Cty., Mont.*, 637 F.3d 1013, 1019 (9th Cir. 2011). We "may affirm a grant of summary judgment on

9

any ground supported by the record." *Curley v. City of N. Las Vegas*, 772 F.3d 629, 631 (9th Cir. 2014).

We review the district court's decision to grant a permanent injunction for abuse of discretion. *La Quinta Worldwide LLC v. Q.R.T.M., S.A. de C.V.*, 762 F.3d 867, 879 (9th Cir. 2014) (citing *Interstellar Starship Servs., Ltd. v. Epix, Inc.*, 304 F.3d 936, 941 (9th Cir. 2002)). We review questions of law underlying the district court's decision *de novo*. *See Ting v. AT&T*, 319 F.3d 1126, 1135 (9th Cir. 2003). "If the district court 'identified and applied the correct legal rule to the relief requested,' we will reverse only if the court's decision 'resulted from a factual finding that was illogical, implausible, or without support in inferences that may be drawn from the facts in the record.'" *Herb Reed Enters., LLC v. Fla. Entm't Mgmt., Inc.*, 736 F.3d 1239, 1247 (9th Cir. 2013) (quoting *United States v. Hinkson*, 585 F.3d 1247, 1263 (9th Cir. 2009) (en banc)).

## DISCUSSION

### I. Equal Protection

#### A. Similarly Situated

"The Equal Protection Clause of the Fourteenth Amendment commands that no State shall 'deny to any person within its jurisdiction the equal protection of the laws,' which is essentially a direction that all persons similarly situated should be

treated alike." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985) (quoting *Plyler v. Doe*, 457 U.S. 202, 216 (1982)). To prevail on an Equal Protection claim, plaintiffs must show "that a class that is similarly situated has been treated disparately." *Christian Gospel Church, Inc. v. City & Cty. of S.F.*, 896 F.2d 1221, 1225 (9th Cir. 1990), *superseded on other grounds by* 42 U.S.C. § 2000e.

"The first step in equal protection analysis is to identify the state's classification of groups." *Country Classic Dairies, Inc. v. Milk Control Bureau*, 847 F.2d 593, 596 (9th Cir. 1988). "The groups must be comprised of similarly situated persons so that the factor motivating the alleged discrimination can be identified." *Thornton v. City of St. Helens*, 425 F.3d 1158, 1167 (9th Cir. 2005). In this instance, DACA recipients do not need to be similar in all respects to other noncitizens who are eligible for drivers' licenses, but they must be similar in those respects that are relevant to Arizona's own interests and its policy. *See Nordlinger v. Hahn*, 505 U.S. 1, 10 (1992) ("The Equal Protection Clause does not forbid classifications. It simply keeps governmental decisionmakers from treating differently persons who are in all *relevant* respects alike." (emphasis added)).

We previously held that DACA recipients and other categories of noncitizens who may rely on EADs are similarly situated with regard to their right

11

to obtain drivers' licenses in Arizona. *See ADAC II*, 757 F.3d at 1064. The material facts and controlling authority remain the same from the preliminary injunction stage. Thus, we again hold that in all relevant respects DACA recipients are similarly situated to noncitizens eligible for drivers' licenses under Arizona's policy. Nonetheless, for clarity and completeness, we address once more Defendants' arguments.

Defendants assert that DACA recipients are not similarly situated to other noncitizens eligible for drivers' licenses under Arizona's policy because DACA recipients neither received nor applied for relief provided by the INA, or any other relief authorized by federal statute. Particularly relevant here, Defendants note that eligible noncitizens under the categories of (c)(9) and (c)(10) are tied to relief expressly found in the INA: adjustment of status (INA § 245; 8 U.S.C. § 1255; 8 C.F.R. § 274a.12(c)(9)) and cancellation of removal (INA § 240A; 8 U.S.C. § 1229b; 8 C.F.R. § 274a.12(c)(10)), respectively. In contrast, Defendants contend that DACA recipients' presence in the United States does not have a connection to federal law but rather reflects the Executive's discretionary decision not to enforce the INA.

We continue to disagree. *See ADAC II*, 757 F.3d at 1061. As explained below, Arizona has no cognizable interest in making the distinction it has for

12

drivers' licenses purposes. The federal government, not the states, holds exclusive authority concerning direct matters of immigration law. *DeCanas v. Bica*, 424 U.S. 351, 354 (1976), *superseded by statute on other grounds as recognized in Arizona*, 132 S. Ct. at 2503–04. The states therefore may not make immigration decisions that the federal government, itself, has not made, *Plyler*, 457 U.S. at 225 (citing *Mathews v. Diaz*, 426 U.S. 67, 81 (1976)). Arizona's encroachment into immigration affairs—making distinctions between groups of immigrants it deems not to be similarly situated, despite the federal government's decision to treat them similarly—therefore seems to exceed its authority to decide which aliens are similarly situated to others for Equal Protection purposes. In other words, the "similarly situated" analysis must focus on factors of similarity and distinction pertinent to the state's policy, not factors outside the realm of its authority and concern.

Putting aside that limitation, the INA explicitly authorizes the Secretary of Homeland Security to administer and enforce all laws relating to immigration and naturalization. INA § 103(a)(1); 8 U.S.C. § 1103(a)(1). As part of this authority, it is well settled that the Secretary can exercise deferred action, a form of prosecutorial discretion whereby the Department of Homeland Security declines to pursue the removal of a person unlawfully present in the United States.

The INA expressly provides for deferred action as a form of relief that can be granted at the Executive's discretion. For example, INA § 237(d)(2); 8 U.S.C. § 1227(d)(2), allows a noncitizen who has been denied an administrative stay of removal to apply for deferred action. Certain individuals are also "eligible for deferred action" under the INA if they qualify under a set of factors. *See* INA § 204(a)(1)(D)(i)(II); 8 U.S.C. § 1154(a)(1)(D)(i)(II). Deferred action is available to individuals who can make a showing of "exceptional circumstances." INA § 240(e); 8 U.S.C. § 1229a(e). By necessity, the federal statutory and regulatory scheme, as well as federal case law, vest the Executive with very broad discretion to determine enforcement priorities.[1]

---

[1] Pursuant to this discretion, the Department of Homeland Security and its predecessor, the Immigration and Naturalization Service ("INS"), established a series of general categorical criteria to guide enforcement. For example, the 1978 INS Operating Instructions outlined five criteria for officers to consider in exercising prosecutorial discretion, including "advanced or tender age." O.I. 103.1(a)(1)(ii); *see also Pasquini v. Morris*, 700 F.2d 658, 661 (11th Cir. 1983). Discretion can also cut the other way. For example, the 2011 Morton Memo highlighted "whether the person poses national security or public safety concern," Memorandum from John Morton, Director, U.S. Immigration and Customs Enforcement, on "Exercising Prosecutorial Discretion Consistent with the Civil Immigration Enforcement Priorities of the Agency for the Apprehension, Detention, and Removal of Aliens" (June 17, 2011), and the 2014 Johnson Memo identifies the "highest [enforcement] priority" as noncitizens who might represent a threat to "national security, border security, and public safety," Memorandum from Jeh Charles Johnson, Secretary, Department of Homeland Security, on "Policies for the Apprehension, Detention and Removal of Undocumented Immigrants"

(continued...)

Congress expressly charged the Department of Homeland Security with the responsibility of "[e]stablishing national immigration enforcement policies and priorities." 6 U.S.C. § 202(5). The Department of Homeland Security regulations describe deferred action as "an act of administrative convenience to the government which gives some cases lower priority." 8 C.F.R. § 274a.12(c)(14). Additionally, the Supreme Court has made it clear that "an agency's decision not to prosecute or enforce, whether through civil or criminal process, is a decision generally committed to an agency's absolute discretion." *Heckler v. Chaney*, 470 U.S. 821, 831 (1985). The Supreme Court has explained that the Secretary has discretion to exercise deferred action at each stage of the deportation process, and has acknowledged the long history of the Executive "engaging in a regular practice . . . of exercising that discretion for humanitarian reasons or simply for its own convenience." *Reno v. Am.-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 483–84 (1999); *see also id.* n.8; *Arizona*, 132 S. Ct. at 2499 (noting that "[a] principal feature of the removal system is the broad discretion exercised by" the Executive); *Texas v. United States,* 106 F.3d 661, 667 (5th Cir. 1997) (noting the

---

[1](...continued)
(November 20, 2014).

15

State of Texas's concession that the INA "places no substantive limits on the Attorney General and commits enforcement of the INA to her discretion").[2]

Defendants' argument fails because they attempt to distinguish categories of EAD-holders in a way that does not amount to any relevant difference. Like adjustment of status, (c)(9), and cancellation of removal, (c)(10), deferred action is a form of relief grounded in the INA. Moreover, the exercise of prosecutorial discretion in deferred action flows from the authority conferred on the Secretary by the INA.

---

[2] In the past, the Department of Homeland Security and the INS have granted deferred action to different groups of noncitizens present in the United States. In 1977, the Attorney General granted stays of removal to 250,000 nationals of certain countries (known as "Silva Letterholders"). *Silva v. Levi*, No. 76-C4268 (N.D. Ill. 1977), *modified on other grounds sub nom. Silva v. Bell*, 605 F.2d 978 (7th Cir.1979). In 1990, the INS instituted the "Family Fairness" program that deferred the deportation of 1.5 million family members of noncitizens who were legalized through the Immigration Reform and Control Act. *See* Immigration Reform and Control Act of 1986, Pub. L. No. 99-603, 100 Stat. 3359; Memorandum for Regional Commissioners, INS, from Gene McNary, Commissioner, INS, "Family Fairness: Guidelines for Voluntary Departure under 8 CFR 242.5 for the Ineligible Spouses and Children of Legalized Aliens" (Feb. 2, 1990). In 1992, President Bush directed the Attorney General to grant deferred enforced departure to 190,000 Salvadorans. *See* Immigration Act of 1990 § 303, Public Law 101-649 (Nov. 29, 1990); https://www.gpo.gov/fdsys/pkg/FR-1994-12-06/html/94-30088.htm. And nationals of Liberia were granted deferred enforced departure until September 30, 2016, http://www.uscis.gov/humanitarian/temporary-protected-status-deferred-enforced-departure/deferred-enforced-departure.

16

Defendants provide two criteria to explain when they deem an EAD satisfactory proof of authorized presence: the applicant has formal immigration status, or the applicant is on the path to formal immigration status. Neither criteria suffices to render DACA recipients not similarly situated to other EAD-holders on any basis pertinent to Arizona's decision whether to grant them drivers' licenses. Like DACA recipients, many noncitizens who apply for adjustment of status and cancellation of removal—including individuals with (c)(9) and (c)(10) EADs—do not, and may never, possess formal immigration status. *See Guevara v. Holder*, 649 F.3d 1086, 1095 (9th Cir. 2011).

Additionally, "submission of an application does not connote that the alien's immigration status has changed." Thus, merely applying for immigration relief does not signal a clear path to formal immigration status. *Vasquez de Alcantar v. Holder*, 645 F.3d 1097, 1103 (9th Cir. 2011) (quoting *United States v. Elrawy*, 448 F.3d 309, 313 (5th Cir. 2006)). Indeed, given how frequently these applications are denied, "the supposed 'path' may lead to a dead end." *ADAC II*, 757 F.3d at 1065. In this regard, noncitizens holding (c)(9) and (c)(10) EADs are no different from DACA recipients. And as discussed above, DACA recipients have a temporary reprieve—deferred action—that is provided for by the INA, pursuant to the prosecutorial discretion statutorily delegated to the Executive.

17

Therefore, in all relevant respects, DACA recipients are similarly situated to other categories of noncitizens who may rely on EADs to obtain drivers' licenses under Arizona's policy.

**B. State Interest**

The next step in an Equal Protection analysis is to determine the applicable level of scrutiny. *Country Classic Dairies*, 847 F.2d at 596. Although we do not ultimately decide the Equal Protection issue, we remain of the view, articulated in our preliminary injunction opinion, that Arizona's policy may well fail even rational basis review. So, as before, we need not reach what standard of scrutiny applies.[3] *See ADAC II*, 757 F.3d at 1065.

Arizona's policy must be "rationally related to a legitimate state interest" to withstand rational basis review. *City of Cleburne*, 473 U.S. at 440. On appeal, Defendants advance six rationales for Arizona's policy, none of which persuade us that Plaintiffs' argument under the Equal Protection Clause is not at least

---

[3] In cases involving alleged discrimination against noncitizens authorized to be present in the United States, the Supreme Court has consistently applied strict scrutiny to the state action at issue. *See, e.g.*, *Nyquist v. Mauclet*, 432 U.S. 1, 7 (1977); *Graham v. Richardson*, 403 U.S. 365, 372 (1971). Where the alleged discrimination targets noncitizens who are not authorized to be present, the Supreme Court applies rational basis review. *See Plyler*, 457 U.S. at 223–24.

sufficiently strong to trigger the constitutional avoidance doctrine we ultimately invoke.

First, Defendants argue that Arizona's policy is rationally related to the State's concern that it could face liability for improperly issuing drivers' licenses to DACA recipients. But as the district court observed, the depositions of ADOT Director John S. Halikowski and Assistant Director of the Motor Vehicle Division Stacey K. Stanton did not yield support for this rationale. Neither witness was able to identify any instances in which the state faced liability for issuing licenses to noncitizens not authorized to be present in the country. *ADAC III*, 81 F. Supp. 3d at 807. So the record probably does not establish that there is a rational basis for this concern.

Second, Defendants contend that Arizona's policy serves the State's interest in preventing DACA recipients from making false claims for public assistance. As the district court noted, however, Director Halikowski and Assistant Director Stanton testified that they had no basis for believing that drivers' licenses could be used to access state and federal benefits. It follows that this concern is probably not a rational basis justifying Arizona's policy either. *Id.* (citing *ADAC II*, 757 F.3d at 1066).

Third, Defendants claim that Arizona's policy is meant to reduce the administrative burden of issuing drivers' licenses to DACA recipients, only to have to revoke them once the DACA program is terminated. The district court found this argument lacked merit, noting this court's observation that it is less likely that Arizona will need to revoke the licenses of DACA recipients than of noncitizens holding (c)(9) and (c)(10) EADs, because applications for adjustment of status or cancellation of removal are routinely denied.[4] *ADAC III*, 81 F. Supp. 3d at 807 (citing *ADAC II*, 757 F.3d at 1066–67). Indeed, noncitizens with (c)(10) EADs are already in removal proceedings, which means they are further along in the deportation process than are many DACA recipients. The administrative burden of issuing and revoking drivers' licenses for DACA recipients is not greater than the burden of issuing and revoking drivers' licenses for noncitizens holding (c)(9) and (c)(10) EADs. Certainly, the likelihood of having to do so does not distinguish these two classes of noncitizens, as (c)(9) and (c)(10) applications for relief are frequently denied.

_____

[4] Defendants suggest "later-developed facts" indicate that noncitizens holding (c)(9) and (c)(10) EADs are on the path to permanent residency. We are not convinced that *achieving* certain forms of relief (adjustment of status or cancellation of removal) alters the fact that applications for such relief are regularly denied in very great numbers.

20

Fourth, Defendants argue that Arizona has an interest in avoiding financial harm to individuals who may be injured in traffic accidents by DACA recipients. Defendants contend that individuals harmed by DACA recipients may be left without recourse when the DACA program is terminated and DACA recipients are removed from the country. But this rationale applies equally to individuals with (c)(9) and (c)(10) EADs. These noncitizens may find their applications for immigration relief denied and may be quickly removed from the country, leaving those injured in traffic accidents exposed to financial harm. Nevertheless, Arizona issues drivers' licenses to noncitizens holding (c)(9) and (c)(10) EADs.

Fifth, Defendants contend that denying licenses to DACA recipients serves the goal of consistently applying ADOT policy. But ADOT *in*consistently applies its own policy by denying licenses to DACA recipients while providing licenses to holders of (c)(9) and (c)(10) EADs. Arizona simply has no way to know what "path" noncitizens in any of these categories will eventually take. DACA recipients appear similar to individuals who are eligible under Arizona's policy with respect to all the criteria ADOT relies on. ADOT thus applies its own immigration classification with an uneven hand by denying licenses only to DACA recipients. *See, e.g.*, *Yick Wo. v. Hopkins*, 118 U.S. 356, 373–74 (1886) ("[I]f [the law] is applied and administered by public authority with an evil eye and an

21

unequal hand, so as practically to make unjust and illegal discriminations between persons in similar circumstances, material to their rights, the denial of equal justice is still within the prohibition of the constitution.").

Sixth, Defendants claim that Arizona's policy is rationally related to ADOT's statutory obligation to administer the state's driver's license statute. ADOT's disparate treatment of DACA recipients pursuant to the driver's license statute relies on the premise that federal law does not authorize DACA recipients' presence in the United States. This rationale is essentially an assertion of the state's authority to decide whether immigrants' presence is authorized under federal law. Rather than evaluating that assertion as part of the Equal Protection analysis, we defer doing so until our discussion of our ultimate, preemption ground for decision, which we adopt as part of our constitutional avoidance approach.

Before proceeding to that discussion, it bears noting, once again, *see ADAC II*, 757 F.3d at 1067, that the record *does* suggest an additional reason for Arizona's policy: a dogged animus against DACA recipients. The Supreme Court has made very clear that such animus cannot constitute a legitimate state interest, and has cautioned against sowing the seeds of prejudice. *See Romer v. Evans*, 517 U.S. 620, 634 (1996); *see also City of Cleburne*, 473 U.S. at 464 (Marshall, J., concurring in the judgment in part, and dissenting in part) ("Prejudice, once let

22

loose, is not easily cabined."). "The Constitution's guarantee of equality must at the very least mean that a bare . . . desire to harm a politically unpopular group cannot justify disparate treatment of that group." *United States v. Windsor*, 133 S. Ct. 2675, 2681 (2013) (citation omitted).

## II. Preemption

We do not "decide federal constitutional questions where a dispositive nonconstitutional ground is available." *City of L.A. v. Cty. of Kern*, 581 F.3d 841, 846 (9th Cir. 2009) (quoting *Correa v. Clayton*, 563 F. 2d 396, 400 (9th Cir. 1977)). While preemption derives its force from the Supremacy Clause of the Constitution, "it is treated as 'statutory' for purposes of our practice of deciding statutory claims first to avoid unnecessary constitutional adjudications." *Douglas v. Seacoast Prods.*, 431 U.S. 265, 271–72 (1977).[5] Given the formidable Equal Protection concerns Arizona's policy raises, we turn to a preemption analysis as an

---

[5] Though preemption principles are rooted in the Supremacy Clause, this court has previously applied the principle that preemption does not implicate a constitutional question for purposes of constitutional avoidance. *See Hotel Emps. & Rest. Emps. Int'l Union v. Nev. Gaming Comm'n*, 984 F.2d 1507, 1512 (9th Cir. 1993) (holding that *Pullman* abstention was not warranted for preemption claims because "preemption is not a constitutional issue."); *Knudsen Corp. v. Nev. State Dairy Comm'n*, 676 F.2d 374, 377 (9th Cir. 1982) (same).

23

alternative to resting our decision on the Equal Protection Clause.[6] Doing so, we conclude that Arizona's policy encroaches on the exclusive federal authority to create immigration classifications and so is displaced by the INA.

The "[p]ower to regulate immigration is unquestionably exclusively a federal power." *DeCanas*, 424 U.S. at 354. The Supreme Court's immigration jurisprudence recognizes that the occupation of a regulatory field may be "inferred from a framework of regulation 'so pervasive . . . that Congress left no room for the States to supplement it.'" *Arizona*, 132 S. Ct. at 2501 (quoting *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947)). The Supreme Court has also indicated that the INA provides a pervasive framework with regard to the admission, removal, and presence of aliens. *See Chamber of Commerce of U.S. v. Whiting*, 131 S. Ct. 1968, 1973 (2011) (quoting *DeCanas*, 424 U.S. at 353, 359); *cf.*

---

[6] In their opening brief, Defendants argue preemption is not properly before this court because Plaintiffs did not appeal the district court's dismissal of their preemption claim. But at oral argument, defense counsel offered to provide supplemental briefing on the issue. Separately, Plaintiffs noted that Defendants raised the Take Care argument for the first time on appeal and argued it ought not be considered because it was not presented to the district court. Following oral argument, we requested and the parties submitted supplemental briefing on both issues. Defendants' supplemental brief conceded that, in light of the considerations articulated in *Olympia Pipe Line Co. v. City of Seattle*, 437 F.3d 872 (9th Cir. 2006), we may properly consider preemption in this case.

*Arizona*, 132 S. Ct. at 2499 ("Federal governance of immigration and alien status is extensive and complex.").

To be sure, not all state regulations touching on immigration are preempted. *See Chamber of Commerce*, 131 S. Ct. at 1974. But states may not directly regulate immigration. *Valle del Sol Inc. v. Whiting*, 732 F.3d 1006, 1023 (9th Cir. 2013). In particular, the power to classify aliens for immigration purposes is "committed to the political branches of the Federal Government." *Plyler*, 457 U.S. at 225 (quoting *Mathews*, 426 U.S. at 81). "The States enjoy no power with respect to the classification of aliens." *Plyler*, 457 U.S. at 225. Because Arizona created a new immigration classification when it adopted its policy regarding driver's license eligibility, it impermissibly strayed into the exclusive domain of the INA.

States can regulate areas of traditional state concern that might impact noncitizens. *See DeCanas*, 424 U.S. at 355. Permissible state regulations include those that mirror federal objectives and incorporate federal immigration classifications. *Plyler*, 457 U.S. at 225–26. But a law that regulates an area of traditional state concern can still effect an impermissible regulation of immigration.

For example, in *Toll v. Moreno*, the Supreme Court held that preemption principles foreclosed a state policy concerning the imposition of tuition charges and fees at a state university on the basis of immigration status. 458 U.S. 1, 16–17 (1982). Similarly, the Third Circuit has held that municipal ordinances preventing unauthorized aliens from renting housing constituted an impermissible regulation of immigration and were preempted by the INA. *Lozano v. City of Hazleton*, 724 F.3d 297, 317 (3d Cir. 2013) (emphasis added). Although the housing ordinances did not directly regulate immigration in the sense of dictating who could or could not be admitted into the United States, the Third Circuit concluded that they impermissibly "intrude[d] on the regulation of residency *and presence* of aliens in the United States." *Id.* (emphasis added).

Similarly, the Fifth Circuit has held that an ordinance "allow[ing] state courts to assess the legality of a non-citizen's presence" in the United States was preempted because it "open[ed] the door to conflicting state and federal rulings on the question." *Villas at Parkside Partners v. City of Farmers Branch*, 726 F.3d 524, 536 (5th Cir. 2013). The Fifth Circuit's decision was based on its recognition that "[t]he federal government alone . . . has the power to classify non-citizens." *Id.* In accord with these decisions, the Eleventh Circuit held that a state law prohibiting courts from recognizing contracts involving unlawfully present aliens

was preempted as "a thinly veiled attempt to regulate immigration under the guise of contract law." *See United States v. Alabama*, 691 F.3d 1269, 1292–96 (11th Cir. 2012).

Here, Arizona's policy ostensibly regulates the issuance of drivers' licenses, admittedly an area of traditional state concern. *See Chamber of Commerce*, 131 S. Ct. at 1983. But its policy necessarily "embodies the State's independent judgment that recipients of [DACA] are not 'authorized' to be present in the United States '*under federal law*.'" *ADAC II*, 757 F.3d at 1069 (Christen, J., concurring). Indeed, the Arizona Executive Order declared that "the Deferred Action program does not and cannot confer lawful or authorized . . . presence upon the unlawful alien applicants." Executive Order 2012–06 at 1. The Order also announced Arizona's view that "[t]he issuance of Deferred Action or Deferred Action . . . [EADs] to unlawfully present aliens does not confer upon them any lawful *or* authorized status." *Id.* (emphasis added). To implement the Order, ADOT initiated a policy of denying licenses to DACA recipients pursuant to Arizona's driver's license statute, which requires that applicants "submit proof satisfactory to the department that the applicant's presence in the United States is *authorized under federal law*." Ariz. Rev. Stat. Ann. § 28–3153(D) (emphasis added).

27

Arizona points to three criteria to justify treating EAD recipients differently than individuals with (c)(9) and (c)(10) EADs,[7] even though the federal government treats their EADs the same in all relevant respects. But Arizona's three criteria—that an applicant: has formal status; is on a path to formal status; or has applied for relief expressly provided for in the INA—cannot be equated with "authorized presence" under federal law. DACA recipients and noncitizens with (c)(9) and (c)(10) EADs all lack formal immigration status, yet the federal government permits them to live and work in the country for some period of time, provided they comply with certain conditions.

Arizona thus distinguishes between noncitizens based on its *own* definition of "authorized presence," one that neither mirrors nor borrows from the federal immigration classification scheme. And by arranging federal classifications in the way it prefers, Arizona impermissibly assumes the federal prerogative of creating immigration classifications according to its own design.[8] Arizona engages in this

---

[7] As we have noted, recipients of (c)(9) and (c)(10) documents are noncitizens who have applied for adjustment of status and cancellation of removal, respectively. *See* 8 C.F.R. § 274a.12(c)(9)–(10).

[8] Defendants' continual insistence that Arizona's policy is not preempted because the DACA program lacks "the force of law" reflects a misunderstanding of the preemption question. Preemption is not a gladiatorial contest that pits the DACA Memorandum against Arizona's policy. Rather, Arizona's policy is

(continued...)

28

"exercise of regulatory bricolage," *ADAC II*, 757 F.3d at 1072 (Christen, J., concurring), despite the fact that "States enjoy no power with respect to the classification of aliens," *Plyler*, 457 U.S. at 225.

That this case involves classes of aliens the Executive has, as a matter of discretion, placed in a low priority category for removal is a further consideration weighing against the validity of Arizona's policy. The Supreme Court has emphasized that "[a] principal feature of the removal system is the broad discretion exercised by immigration officials." *Arizona*, 132 S. Ct. at 2499. And the Court has specifically recognized that federal statutes contemplate and protect the discretion of the Executive Branch when making determinations concerning deferred action. *See Reno*, 525 U.S. at 484–86. The discretion built into statutory removal procedures suggests that auxiliary state regulations regarding the presence of aliens in the United States are particularly intrusive on the overall federal statutory immigration scheme.

---

[8](...continued)
preempted by the supremacy of federal authority under the INA to create immigration categories. Additionally, because Arizona's novel classification scheme includes not just DACA recipients but also recipients of regular deferred action and deferred enforced departure, our conclusion that Arizona's scheme impermissibly creates immigration classifications not found in federal law is not dependent upon the continued vitality of the DACA program.

Unable to point to any federal statute or regulation that justifies classifying individuals with (c)(9) and (c)(10) EADs as authorized to be present while excluding recipients of deferred action or deferred enforced departure, Defendants argue that Arizona properly relied on statements by the U.S. Citizenship and Immigration Service that "make clear that deferred action does not confer a lawful immigration status." These statements take the form of an email from a local U.S. Citizenship and Immigration Service Community Relations Officer in response to an inquiry from ADOT. In the email, the officer notes that DACA recipients applying for work authorization should fill in category "C33" and not category "C14," which is the category for regular deferred action.

This email does nothing to further Defendants' argument. The officer's statement in no way suggests that federal law supports Arizona's novel classifications. And even if it did, an email from a local U.S. Citizenship and Immigration Services Officer is not a source of "federal law," nor an official statement of the government's position.[9]

---

[9] In *ADAC II*, Defendants also argued that a "Frequently Asked Questions" section of the U.S. Citizenship and Immigration Services Website and a Congressional Research Service Memorandum demonstrated that Arizona's classification found support in federal law. *See* 757 F.3d at 1073. We understand Defendants to have abandoned these arguments. But even if they had not, neither source is a definitive statement of federal law.

The INA, indeed, directly undermines Arizona's novel classifications. For purposes of determining the admissibility of aliens other than those lawfully admitted for permanent residence, the INA states that if an alien is present in the United States beyond a "period of stay *authorized* by the Attorney General" or without being admitted or paroled, the alien is "deemed to be *unlawfully present* in the United States." INA § 212(a)(9)(B)(ii); 8 U.S.C. § 1182(a)(9)(B)(ii) (emphases added). The administrative regulations implementing this section of the INA, to which we owe deference, establish that deferred action recipients do not accrue "unlawful presence" for purposes of calculating when they may seek admission to the United States. 8 C.F.R. § 214.14(d)(3); 28 C.F.R. § 1100.35(b)(2). Because such recipients are present without being admitted or paroled, their stay must be considered "authorized by the Attorney General," for purposes of this statute. INA § 212(a)(9)(B)(ii); 8 U.S.C. § 1182(a)(9)(B).

The REAL ID Act, which amended the INA, further undermines Arizona's interpretation of "authorized presence." REAL ID Act of 2005, Pub. L. No. 109-13, div. B, 119 Stat. 231. The Real ID Act amendments provide that states may issue a driver's license or identification card to persons who can demonstrate they are "authorized [to] stay in the United States." *Id.* § 202(c)(2)(C)(i)–(ii). Persons with "approved deferred action status" are expressly identified as being present in

31

the United States during a "period of authorized stay," for the purpose of issuing state identification cards. *Id.* § 202(c)(2)(B)(viii), (C)(ii).

Despite Arizona's clear departure from federal immigration classifications, Defendants argue Arizona's policy is not a "back-door regulation of immigration." They compare it to the Louisiana Supreme Court policy the Fifth Circuit upheld in *LeClerc v. Webb*, which prohibited any alien lacking permanent resident status from joining the state bar. 419 F.3d 405, 410 (5th Cir. 2005). But the Louisiana Supreme Court did not create a novel immigration classification as Arizona does here. Rather, it permissibly borrowed from existing federal classifications, distinguishing "those aliens who have attained permanent resident status in the United States" from those who have not. *Id.* (quoting *In re Bourke*, 819 So. 2d 1020, 1022 (La. 2002)).

Defendants also argue that sections of the INA granting states discretion to provide public benefits to certain aliens, including deferred action recipients, suggest that Congress "has not intended to occupy a field so vast that it precludes all state regulations that touch upon immigration." *See* 8 U.S.C. §§ 1621, 1622. But we do not conclude that Congress has preempted all state regulations that touch upon immigration. Arizona's policy is preempted not because it denies state

32

benefits to aliens, but because the classification it uses to determine which aliens receive benefits does not mirror federal law.

In sum, Defendants offer no foundation for an interpretation of federal law that classifies individuals with (c)(9) and (c)(10) EADs as having "authorized presence," but not DACA recipients. Arizona's policy of denying drivers' licenses to DACA recipients based on its own notion of "authorized presence" is preempted by the exclusive authority of the federal government under the INA to classify noncitizens.

## III. Constitutionality of the DACA Program

We decline to rule on the constitutionality of the DACA program, as the issue is not properly before our court; only the lawfulness of Arizona's policy is in question.

We note, however, that the discussion above is quite pertinent to both of Defendants' primary arguments undergirding their challenge to the constitutionality of the DACA program. First, Defendants argue that the Executive has no power, independent of Congress, to enact the DACA program. But as we have discussed, the INA is replete with provisions that confer prosecutorial discretion on the Executive to establish its own enforcement priorities. *See supra*, section II. Third parties generally may not contest the exercise of this discretion,

*see Linda R.S. v. Richard D.*, 410 U.S. 614, 619 (1973), including in the immigration context, *see Sure-Tan, Inc. v. NLRB*, 467 U.S. 883, 897 (1984).[10]

Second, Defendants contend that the DACA program amounts to a wholesale suspension of the INA's provisions, which in turn violates the President's obligation to "take Care that the Laws be faithfully executed." U.S. Const. art. II, § 3 ("the Take Care Clause"). But, according to an amicus brief filed by the Department of Justice, the Department of Homeland Security only has funding annually to remove a few hundred thousand of the 11.3 million undocumented aliens living in the United States. Constrained by these limited resources, the Department of Homeland Security must make difficult decisions about whom to prioritize for removal. Despite Defendants' protestations, they

---

[10] Congress's failure to pass the Development, Relief, and Education for Alien Minors ("DREAM") Act does not signal the illegitimacy of the DACA program. The Supreme Court has admonished that an unenacted bill is not a reliable indicator of Congressional intent. *See Red Lion Broad. Co. v. FCC*, 395 U.S. 367, 381 n.11 (1969). Moreover, the DREAM Act and the DACA program are not interchangeable policies because they provide different forms of relief (*i.e.*, the DREAM Act would have granted conditional residency that could lead to permanent residency, whereas the DACA program offers a more limited, temporary deferral of removal).

have not shown that the Department of Homeland Security failed to comply with

its responsibilities to the extent its resources permit it to do so.[11]

For that reason, this case is nothing like *Train v. City of New York*, a case

relied upon by Defendants, in which the Supreme Court affirmed an order directing

a presidential administration to spend money allocated by Congress for certain

projects.  420 U.S. 35, 40 (1975).  Here, by contrast, the Department of Justice

asserts that Congress has not appropriated sufficient funds to remove all 11.3

million undocumented aliens, and several prior administrations have adopted

programs, like DACA, to prioritize which noncitizens to remove.  *See supra* n.2.

"The power to decide when to investigate, and when to prosecute, lies at the core

of the Executive's duty to see to the faithful execution of the laws . . . ."  *Cmty. for

Creative Non-Violence v. Pierce*, 786 F.2d 1199, 1201 (D.C. Cir. 1986); *see

Arpaio v. Obama*, 797 F.3d 11, 18 (D.C. Cir. 2015).

---

[11] Indeed, the Department of Justice's brief reports that the administration has removed approximately 2.4 million noncitizens from the country from 2009 to 2014, a number the government states is "unprecedented."  Prioritizing those removal proceedings for noncitizens who represent a threat to "national security, border security, and public safety," Memorandum from Jeh Charles Johnson, Secretary, Department of Homeland Security, on "Policies for the Apprehension, Detention and Removal of Undocumented Immigrants" (November 20, 2014), cannot fairly be described as abdicating the agency's responsibilities.

Further, as we have noted, the Supreme Court has acknowledged the history of the Executive engaging in a regular practice of prosecutorial discretion in enforcing the INA. *See Reno*, 525 U.S. at 483–84 & n.8 ("To ameliorate a harsh and unjust outcome, the INS may decline to institute proceedings, terminate proceedings, or decline to execute a final order of deportation. This commendable exercise in administrative discretion, . . . is now designated as deferred action." (quoting 6 C. Gordon, S. Mailman, & S. Yale-Loehr, Immigration Law and Procedure § 72.03 [2][h] (1998))). This history includes "general policy" non-enforcement, such as deferred action granted to foreign students affected by Hurricane Katrina, U.S. Citizenship and Immigration Services, *Interim Relief for Certain Foreign Academic Students Adversely Affected by Hurricane Katrina: Frequently Asked Questions (FAQ)* at 1 (Nov. 25, 2005), and deferred action for certain widows and widowers of U.S. citizens, Memorandum for Field Leadership, U.S. Citizenship and Immigration Services, from Donald Neufeld, Acting Associate Director, U.S. Citizenship and Immigration Services, "Guidance Regarding Surviving Spouses of Deceased U.S. Citizens and Their Children" at 1 (Sept. 4, 2009).[12]

---

[12]The recent ruling in *Texas v. United States*, 809 F.3d 134 (5th Cir. 2015) *petition for cert. granted sub nom. United States v. Texas*, — S. Ct. — , 2016 WL
(continued...)

We reiterate that, in the end, Arizona's policy is preempted not because the DACA program is or is not valid, but because the policy usurps the authority of the federal government to create immigrant classifications.

## IV. Permanent Injunction

Before a court may grant a permanent injunction, the plaintiff must satisfy a four-factor test, demonstrating:

> (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction.

*Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 141 (2010) (quoting *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006)).

Plaintiffs have proven that they suffer irreparable injury as a result of Arizona's policy, and that remedies available at law are inadequate to compensate them for that injury. In particular, Plaintiffs have demonstrated that their inability

---

[12](...continued) 207257 (U.S. Nov. 20, 2015) (mem.), is also inapposite to Defendants' constitutional claims. There, several states challenged the Deferred Action for Parents of Americans and Lawful Permanent Residents program ("DAPA"), including DAPA recipients' eligibility for certain public benefits such as drivers' licenses and work authorization. *Id.* at 149. The court concluded that the states were likely to succeed on their procedural and substantive claims under the Administrative Procedure Act, and expressly declined to reach the Take Care Clause issue. *Id.* at 146 & n.3, 149.

to obtain drivers' licenses limits their professional opportunities. In Arizona, it takes an average of over four times as long to commute to work by public transit than it does by driving, and public transportation is not available in most localities. One ADAC member had to miss full days of work so that she could take her son to his doctors' appointments by bus. Another ADAC member finishes work after midnight but the buses by her workplace stop running at 9 p.m. And as the district court noted, another Plaintiff is a graphic designer whose inability to obtain a driver's license caused her to decline work from clients, while yet another Plaintiff wants to pursue a career as an Emergency Medical Technician but is unable to do so because the local fire department requires a driver's license for employment. *ADAC III*, 81 F. Supp. 3d at 809.

Plaintiffs' inability to obtain drivers' licenses hinders them in pursuing new jobs, attending work, advancing their careers, and developing business opportunities. They thus suffer financial harm and significant opportunity costs. And as we have previously found, the irreparable nature of this injury is exacerbated by Plaintiffs' young age and fragile socioeconomic status. *ADAC II*, 757 F.3d at 1068. Setbacks early in their careers can have significant impacts on Plaintiffs' future professions. *Id.* This loss of opportunity to pursue one's chosen profession constitutes irreparable harm. *Enyart v. Nat'l Conference of Bar*

38

*Exam'rs, Inc.*, 630 F.3d 1153, 1165 (9th Cir. 2011); *see also Chalk v. U.S. Dist. Ct. Cent. Dist. of Cal.*, 840 F.2d 701, 709–10 (9th Cir. 1988) (holding that plaintiff's transfer to a less satisfying job created emotional injury that constituted irreparable harm). Since irreparable harm is traditionally defined as harm for which there is no adequate legal remedy, such as an award of damages, *see Rent-A-Ctr., Inc. v. Canyon Television & Appliance Rental, Inc.*, 944 F.2d 597, 603 (9th Cir. 1991), Plaintiffs have also shown that remedies available at law are inadequate to compensate them.

Plaintiffs have also demonstrated that, after considering the balance of hardships, a remedy in equity is warranted and that the public interest would not be disserved by a permanent injunction. We conclude that Arizona's policy is preempted by federal law. "[I]t is clear that it would not be equitable or in the public's interest to allow the state to violate the requirements of federal law, especially when there are no adequate remedies available." *Valle del Sol*, 732 F.3d at 1029 (quoting *Arizona*, 641 F.3d at 366) (alterations omitted). The public interest and the balance of the equities favor "prevent[ing] the violation of a party's constitutional rights." *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) (citation omitted).

**CONCLUSION**

39

In sum, we find that DACA recipients are similarly situated in all relevant respects to other noncitizens eligible for drivers' licenses under Arizona's policy. And Arizona's refusal to rely on EADs from DACA recipients for purposes of establishing eligibility for drivers' licenses may well violate the Equal Protection Clause for lack of a rational governmental interest justifying the distinction relied upon. Invoking the constitutional avoidance doctrine, we construe the INA as occupying the field of Arizona's classification of noncitizens with regard to whether their presence is authorized by federal law, and as therefore preempting states from engaging in their very own categorization of immigrants for the purpose of denying some of them drivers' licenses. Plaintiffs have shown that they suffer irreparable harm from Arizona's policy and that remedies at law are inadequate to compensate for that harm. Plaintiffs have also shown that a remedy in equity is warranted and that the public interest would not be disserved by a permanent injunction.

Accordingly, we AFFIRM the district court's grant of summary judgment in favor of Plaintiffs. We also AFFIRM the district court's order entering a permanent injunction that enjoins Arizona's policy of denying the EADs issued under the DACA program as satisfactory proof of authorized presence under federal law in the United States.

**AFFIRMED.**

## COUNSEL

Karen Tumlin (argued), Shiu-Ming Cheer, Nicholas Espiritu, Linton Joaquin, and Nora A. Preciado, National Immigration Law Center, Los Angeles, CA; Tanya Broder, National Immigration Law Center, Oakland, CA; Jorge Martin Castillo and Victor Viramontes, Mexican American Legal Defense Educational Fund, Los Angeles, CA; Rodkangyil Danjuma, ACLU Foundation of Northern California, San Francisco, CA; Lee Gelernt and Michael K.T. Tan, American Civil Liberties Union, New York, NY; James Lyall and Daniel J. Pochoda, ACLU of Arizona, Phoenix, AZ; Jennifer C. Newell and Cecillia D. Wang, American Civil Liberties Union Foundation Immigrants' Rights Project, San Francisco, CA; Kelly Flood, ASU Alumni Law Group, Phoenix, AZ, for Plaintiffs-Appellees.

Dominic Draye (argued) and John Robert Lopez, IV, Arizona Attorney General's Office, Phoenix, AZ; Timothy Berg, Sean Hood, and Douglas C. Northup, Fennemore Craig P.C., Phoenix, AZ, for Defendants-Appellants.

Dale Wilcox, Washington, D.C. for Amicus Curiae Immigration Reform Law Institute.

Lindsey Powell, Washington D.C. for Amicus Curiae United States of America.