STATE of Minnesota, Respondent,

v.

Martha Isela REYNUA, Appellant.

No. A10–1946.

Court of Appeals of Minnesota.

Dec. 5, 2011.

Lori Swanson, Attorney General, St. Paul, MN; and Kristen M. Nelsen, Mower County Attorney, Jeremy L. Clinefelter, Assistant County Attorney, Austin, MN, for respondent.

Bruce D. Nestor, De Leon & Nestor, LLC, Minneapolis, MN, for appellant.

Considered and decided by LARKIN, Presiding Judge; BJORKMAN, Judge; and COLLINS, Judge.

## OPINION

COLLINS, Judge.*

Following a bench trial, appellant was convicted of aggravated forgery, perjury,

---

* Retired judge of the district court, serving as     judge of the Minnesota Court of Appeals by

and two counts of fraudulent certificate of title. Appellant argues that (1) her conduct did not constitute aggravated forgery, (2) federal law preempts state prosecution on the aggravated-forgery and perjury charges involving a federal employment-eligibility verification form, and (3) the state presented insufficient evidence to support convictions on several counts. We affirm in part, reverse in part, and remand.

## FACTS

Police executed a search warrant at the Reynua family home in Austin and found a number of documents allegedly providing false identities for various Reynua family members. Police also found documents in the name of "Laura Elena Romero" that police believed had been used by appellant Martha Reynua. Police showed a Minnesota identification card photograph purporting to be that of Romero to Reynua's sister, who identified it as a photograph of Reynua. A follow-up investigation with Hormel Foods disclosed that "Laura Romero" had been hired there. Police obtained the documents provided to Hormel in the hiring process, including the federal I–9 employment-eligibility verification form. They also reviewed the title registrations for two vehicles owned by "Laura Romero" that had been obtained in that name by using the Minnesota identification card with Reynua's photograph.

Reynua was charged with two counts of aggravated forgery in violation of Minn. Stat. § 609.625, subds. 1, 3 (2006); perjury in violation of Minn.Stat. § 609.48, subd. 1 (2006); two counts of fraudulent certificate of title in violation of Minn.Stat. § 168A.30, subd. 1 (2006); and two counts of simple forgery in violation of Minn.Stat. § 609.63, subd. 1(1) (2006). The district court granted in part Reynua's motion to dismiss; dismissing Count 2, aggravated forgery, and Count 7, simple forgery, both involving a social security card.

Reynua had also sought dismissal of Count 1, aggravated forgery, on the ground that her conduct did not constitute aggravated forgery, and dismissal of all five remaining counts on the ground of federal-law preemption of any use of the I–9 employment-eligibility form; all of which the district court denied.

At the ensuing bench trial, an Austin police detective testified about the execution of the search warrant, the documents discovered at the Reynua residence, and the seizure of a cell phone that had a message to Reynua from the time of the search-warrant execution warning her to flee. The detective testified that the employee hired as "Romero" did not show up for work at Hormel the day after the search warrant was executed, having called in to claim an emergency.

The detective testified that with the increasing use by employers of electronic verification, particularly the federal government's E–Verify system, police saw fewer counterfeit identification cards and more cards that were genuine but issued in the name of another person. The detective testified that up to 20 people could have used the "Romero" name and social security number without detection if those uses were dispersed across the country. He testified that he had seen cases in which the same name and social security number had been used four or five times. The detective also testified that he ran the "Romero" social security card number through the computer data base and found "a lady in Texas also associated with the same name and Social Security number."

appointment pursuant to Minn. Const. art. VI, § 10.

A supervisor at Hormel testified that when a person fills out the I–9 form, he or she has already been hired. The I–9 form, which is required by federal law to be supported by some form of identification, is filled out on the first day of work. He testified that Hormel then takes a photograph of the new employee. The supervisor confirmed the identification photo taken of the employee who identified herself as Laura Romero. But he could not testify from memory about the "Laura Romero" hiring process, or identify Reynua as the person who had applied as "Laura Romero."

A deputy registrar in Austin testified about the process for registering motor vehicle titles. He testified that two other people in his office handled the applications, one for a 1994 Jeep and the other for a 1999 Oldsmobile, made in the name of "Laura Romero" and with the identification number shown on the "Romero" Minnesota identification card.

The district court found that the person appearing in court as the defendant Reynua was the same person who applied for work as "Laura Romero." The court noted that the "Laura Romero" signature on all the documents in evidence was the same, and took judicial notice that Reynua was the person depicted in the photograph on the "Laura Romero" Minnesota identification card, as well as the other documents. The district court found Reynua guilty on all five remaining counts; adjudicated a conviction and stayed imposition of sentence on Count 1, aggravated forgery, Count 3, perjury, Count 4, fraudulent certificate of title, and Count 5, fraudulent certificate of title; and placed Reynua on probation for up to ten years. This appeal followed.

## ISSUES

1. Did Reynua's use of the "Laura Romero" Minnesota identification card constitute aggravated forgery under Minn. Stat. § 609.625, subd. 1(1)?

2. Does federal law preempt any prosecution of Reynua for criminal charges based on the I–9 federal employment-eligibility verification form?

3. Is the evidence sufficient to support the convictions?

## ANALYSIS

### *Aggravated forgery*

Reynua argues that her conduct in possessing a Minnesota identification card with another person's name does not constitute aggravated forgery under the applicable statute because an identification card does not create any legal right or privilege but merely establishes the bearer's identity. We agree.

The statute defining aggravated forgery provides in part:

> Whoever, with intent to defraud, falsely makes or alters a *writing or object of any of the following kinds* ... is guilty of aggravated forgery ... :
>
> (1) a writing or object whereby, when genuine, *legal rights, privileges, or obligations are created, terminated, transferred, or evidenced,* ....

Minn.Stat. § 609.625, subd. 1(1) (emphasis added).

A question of statutory interpretation presents a legal issue subject to de novo review. *State v. Carufel*, 783 N.W.2d 539, 542 (Minn.2010).

The district court denied Reynua's motion to dismiss Count 1, aggravated forgery, ruling that because a Minnesota identification card is recognized by several statutes as a means of "proper identification," it "evidences a legal right to identify oneself as the person listed on the card."

The Minnesota identification card shows Reynua's photograph but the card is in the name of "Laura Romero." Reynua argues that this conduct falls within the definition of simple forgery: "us[ing] a false writing, knowing it to be false, for the purpose of identification...." Minn.Stat. § 609.63, subd. 1(1). The district court found Reynua guilty on Count 6, simple forgery, but did not adjudicate a conviction on that count.

The supreme court has affirmed an aggravated-forgery conviction for presenting a check purporting to be signed by another, along with a driver's license and credit cards in the other person's name. *State v. Hanson,* 289 Minn. 103, 105–06, 182 N.W.2d 706, 707–08 (1971). The court's analysis indicates that it was the check, not the driver's license or credit cards used for identification, that constituted the act of forgery. *See id.* at 106, 182 N.W.2d at 708 (noting that the defendant signed a check while purporting to be another person). No Minnesota cases are found in which aggravated forgery was premised on the presentation of a false driver's license or identification card without more.

■ As the analysis in *Hanson* implies, an identification card is not a document that by itself creates any legal rights or privileges. (A driver's license plainly creates a legal right or privilege, but it does so regardless of whether it is presented to another person.) The identification card is merely, as Reynua argues, a document to establish identity. *See* Minn.Stat. §§ 171.06, subd. 3, (application), 171.07,

subd. 3 (stating required elements of identification card). Some other document or representation, such as a check, credit card, or court order, for example, is generally required to entitle the bearer of the identification card to receive money or property or enforce a legal right or privilege.

The state cites statutes recognizing an identification card as proof of identity for various purposes. But an identification card does not entitle a person to open a checking account. It is merely one item required of the applicant for such an account. *See* Minn.Stat. § 48.512, subd. 2(g) (2010). And a person who lacks an identification card may present another document for identification purposes. *Id.* Similarly, although an identification card satisfies the requirement of "proper identification" for purposes of obtaining residential tenant reports, it does not by itself entitle the bearer to a report. *See* Minn. Stat. § 504B.235, subd. 2 (2010). And under the voter-registration statute an identification card is acceptable proof of residence for election-day registration. Minn. Stat. § 201.061, subd. 3(a)(1) (2010). But the prospective voter must also complete a registration application and take an oath before being allowed to vote. *Id.*

The state argues, as the district court also reasoned, that a Minnesota identification card "evidences" the legal right to be the person named on the card, and to have others rely on that identification. But the state does not explain how or why there is a legal right in one's identity.[1] If a false

---

[1] The existence of the crime of identity theft does not establish that there is a legal right in one's identity alone. *See* Minn.Stat. § 609.527, subd. 2 (2010) (defining crime of identity theft as requiring the intent "to commit, aid, or abet any unlawful activity"). Assuming the identity of another, or presenting evidence of the identity of another, is a *means* of committing unlawful activity. *See id.* One

may merely falsely identify oneself as another without thereby causing injury to the rights of the other person. Persons having the identical name may use that common name without infringing on the other's rights so long as they do not seek access to the other's credit card account, bank account, etc. It is the assumption of the identity of another under circumstances in which that identification, along

claim of identity is used along with, for example, a check related to the other person's checking account, or a forged signature of that person on another legal document, then a legal right or privilege has been implicated. But merely claiming to be another person does not of itself implicate a legal right or privilege.[2]

The state argues, nevertheless, that the Minnesota identification card had "legal efficacy," and therefore the falsity in its execution qualifies as aggravated forgery. But the state cites cases from other jurisdictions in which the respective forgery statutes either required only a writing having "legal efficacy," or applied to any writing, so that "legal efficacy" was added judicially as a limitation on criminal liability. See State v. Sandoval, 142 N.M. 412, 166 P.3d 473, 476, 478 (N.M.Ct.App.2007) (applying New Mexico statute defining forgery in terms of a writing purporting to have legal efficacy); State v. Lee–Grigg, 374 S.C. 388, 649 S.E.2d 41, 48 (S.C.Ct. App.2007) (applying South Carolina forgery statute applicable to "any writing or instrument," which had been judicially narrowed by "legal efficacy" rule), aff'd, 387 S.C. 310, 692 S.E.2d 895 (2010).

As Reynua points out, the simple-forgery statute prohibits Reynua's use of the "Laura Romero" identification card. See Minn.Stat. § 609.63, subd. 1(1) (prohibiting "use[ ] [of] a false writing, knowing it to be false, for the purpose of identification or recommendation"). As to the two remaining forgery counts, Reynua argues that she can only be convicted on Count 6, simple forgery.

We agree with the state that the aggravated-forgery and simple-forgery statutes do not have the same elements, and, therefore, do not present the problem of allowing the state to choose (between two statutes "hav[ing] the same elements but differing penalties") the statute with the greater penalty. See State v. Craven, 628 N.W.2d 632, 635 (Minn.App.2001), review denied (Minn. Aug. 15, 2001). But we construe Reynua's argument to be that the language in the simple-forgery statute, which applies to the use of a document "for the purpose of identification," would be superfluous if the aggravated-forgery statute applied to the presenting of a false identification card. See Minn.Stat. § 609.63, subd. 1(1). Under the general principle that statutes that are in pari materia should be construed together, the language of the simple-forgery statute indicates that the legislature did not intend the aggravated-forgery statute to apply to false identification cards. See generally State v. Kolla, 672 N.W.2d 1, 7 (Minn.App. 2003) (stating that statutes that are in pari materia "should be construed in light of one another").

We conclude that the aggravated-forgery statute does not apply to Reynua's conduct of using a false Minnesota identification card. Therefore, the conviction for aggravated forgery under Count 1 must be reversed and vacated. But Reynua is subject to conviction and sentencing for simple forgery under Count 6, on which the district court found her guilty and withheld adjudication.

### Federal preemption

Reynua argues that federal law preempts any state prosecution for con-

---

with other information such as a credit-card number, entails legal rights or privileges that completes the crime of identity theft.

**2.** Reynua could have used the "Laura Romero" identification card, for example, merely to get her friends to call her "Laura." That conduct, which would not have implicated any legal rights or privileges, would not constitute aggravated forgery.

duct involving the I–9 form, a federal form used to verify eligibility for employment based on citizenship or other legal status. Reynua filed a pretrial motion to dismiss five counts based on federal preemption. The district court, however, dismissed Count 2, aggravated forgery, and Count 7, simple forgery, on other grounds; and we have concluded that the conviction on Count 1, aggravated forgery, must be reversed. Reynua's federal-preemption argument relates primarily to Count 3, which alleged that Reynua committed perjury by falsely claiming on the I–9 employment-eligibility verification form to be a citizen or national of the United States. But Reynua argues that the admission of the I–9 application form also tainted her convictions on Counts 4 and 5, fraudulent certificates of title, as well as the finding of guilt on Count 6, simple forgery.

■ Whether federal law preempts state prosecution is a question of law subject to de novo review. *See Thul v. State,* 657 N.W.2d 611, 618 (Minn.App.2003), *review denied* (Minn. May 28, 2003).

The state concedes that as to Count 3 it was reversible error to admit the I–9 form into evidence; therefore, the conviction on Count 3, perjury, must be reversed and vacated. The state argues, however, that admission of the I–9 form was harmless error as to the convictions on Counts 4 and 5, fraudulent certificates of title, and that Reynua was still properly charged with simple forgery in connection with the Minnesota identification card under Count 6. As discussed above, we have concluded that the aggravated-forgery conviction must be reversed and vacated; therefore, we need not address the impact of the admission of the I–9 form on Count 1.

The I–9 form was developed by the United States Attorney General in compliance with IRCA. *See* 8 U.S.C. § 1324a(b)(1)(A) (requiring attestation by employer of eligibility verification on "a form designated or established by the Attorney General by regulation"); 8 C.F.R. § 274a.2(a) (2005) (noting I–9's designation as the form to be used in employment-eligibility verification system). The I–9 form is entitled "Employment Eligibility Verification." On it, Reynua provided the name of "Laura Romero," along with a social security number and an address, and submitted in support the Minnesota identification card in Romero's name and a social security card, also in Romero's name. On the form, she checked the box indicating that she is a citizen of the United States.

IRCA provides that

[a] form designated or established by the Attorney General under this subsection and any information contained in or appended to such form, may not be used for purposes other than for enforcement of this chapter and sections 1001, 1028, 1546, and 1621 of title 18.

8 U.S.C. § 1324a(b)(5).

The state concedes that this provision of IRCA is broad enough to prohibit even use of the I–9 form in a state prosecution for perjury. We agree, given the congressional intent that is evident in this and other provisions in IRCA to preempt the area of employment-related verification of immigration status.

IRCA provides that the employment-eligibility verification system "may not be used for law enforcement purposes, other than for enforcement of this chapter" or the federal perjury and false-statement provisions also referenced in section 1324a(b)(5). 8 U.S.C. § 1324a(d)(2)(F). There is also an express provision preempting state laws imposing sanctions "upon those who employ, or recruit or refer" unauthorized aliens. 8 U.S.C. § 1324a(h)(2). This provision clearly does

not apply to the prosecution of an applicant for employment, such as Reynua. But it is further evidence of a general congressional intent to preempt state legislation in the area.

The United States Supreme Court recently addressed the preemptive effect of IRCA, holding that the law did not preempt Arizona's unauthorized-alien employment law. *Chamber of Commerce v. Whiting*, — U.S. —, —, 131 S.Ct. 1968, 1973, 179 L.Ed.2d 1031 (2011). In dissent, Justice Sotomayor stated that "[u]se of the I–9 form is thus limited to *federal* proceedings, as the majority acknowledges." *Id.* at 2001. In its opinion, the majority rejected the argument that the Arizona law required an employer to use the I–9 form in order to later claim an affirmative defense. *Id.* at 1982 n. 9. Thus, the majority considered the preemptive effect of section 1324a(b)(5) with respect to sanctions on *employers* for employing illegal aliens.

The Supreme Court in *Whiting* was addressing the express preemption of state laws sanctioning employers, and, specifically, the exemption within that preemption provision allowing for state licensing laws. *See id.* at 1977–78. The *Whiting* Court was not dealing with federal immigration provisions directed at unauthorized aliens, or employment applicants, but rather an express reservation to the states of licensing provisions directed at employers. *See id.* at 1987. The Court's opinion does not hold that IRCA lacks a *general* preemptive intent, and specifically notes the ways in which the state statute at issue conformed to federal law. *See id.* Thus, there is nothing in the *Whiting* opinion inconsistent with our conclusion that use of the I–9 form in a state perjury prosecution is preempted by IRCA.

▮ A state law is preempted if the state law obstructs the accomplishment of the full purposes and objectives of the federal legislation. *Silkwood v. Kerr–McGee Corp.*, 464 U.S. 238, 248, 104 S.Ct. 615, 621, 78 L.Ed.2d 443 (1984). IRCA largely targets *employers* for the sanctions it imposes. Only the federal perjury and false-statement provisions referenced in section 1324a(b)(5) are aimed at the *employee*. *See United States v. Arizona*, 641 F.3d 339, 358 (9th Cir.2011). But those federal statutes would be enforced by federal authorities, not local prosecutors in 50 different states. And, as the Ninth Circuit noted in *United States v. Arizona*, the federal act evidences "Congress' intent that systematic state immigration enforcement will occur under the direction and close supervision of the Attorney General." *Id.* at 352. The enforcement of Minnesota's perjury statute is not subject to that direction and supervision. Moreover, state perjury prosecutions could shift the illegal-immigration enforcement focus from the employer to the employee. Thus, a Minnesota perjury prosecution for false statements on the I–9 form would tend to obstruct the full purposes and objectives of IRCA.

The same analysis does not apply to the simple-forgery charge based on the use of the Minnesota identification card. Here, we follow the general principle that "[w]hen federal laws do preempt conflicting state laws, the state laws are preempted only to the extent that they are in conflict with federal law." *Martin ex rel. Hoff v. City of Rochester*, 642 N.W.2d 1, 11 (Minn.2002).

IRCA bars use of the I–9 form and "any information contained in or appended to such form" for purposes other than enforcement of the federal immigration statute and the federal perjury and false-statement provisions. 8 U.S.C. § 1324a(b)(5). But we cannot read this provision so broadly as to preempt a state from enforc-

ing its laws relating to its own identification documents.

■ We conclude that the state, for example, is not barred from prosecuting the crime of display or possession of a fictitious or fraudulently altered Minnesota identification card, Minn.Stat. § 171.22, subd. 1(2), merely because that card has been presented in support of an I–9 federal employment-eligibility verification form. There is a general presumption that the "historic police powers of the State" are not superseded by federal legislation "unless that was the clear and manifest purpose of Congress." *Altria Group, Inc. v. Good,* 555 U.S. 70, 129 S.Ct. 538, 543, 172 L.Ed.2d 398 (2008) (quotation omitted).

Section 1324a(b)(5) prohibits non-federal use of "information" appended to the I–9 form. That language does not exhibit a "clear and manifest purpose" to bar enforcement of state laws pertaining to state identification cards. It would be a significant limitation on state powers to preempt prosecution of state laws prohibiting falsification of state-issued identification cards, let alone to prohibit all use of such cards merely because they are also used to support the federal employment-verification application. *See generally* Minn.Stat. §§ 609.63, subd. 1(1) (prohibiting use of false writing for identification), .652, subd. 2 (prohibiting various acts in creating false identification cards for profit) (2010). We note here that Reynua did not use the "Laura Romero" identification card solely to apply for employment, but also to apply for certificates of title.

Reynua also argues that the other counts are barred by federal preemption because she was arrested and charged in violation of the Supremacy Clause. But Reynua was also charged with simple forgery solely in connection with the Minnesota identification card, as well as with presenting a fraudulent application for a state certificate of title, a crime with no federal implications. There is no indication that Reynua was arrested solely because she committed perjury on the I–9 form or used the false identification card in support of that form. Thus, Reynua's argument for dismissal of the entire prosecution on federal-preemption grounds fails.

Reynua argues, however, that the I–9 evidence was critical to the state's entire case, and, therefore, her conviction on the other counts was substantially affected by that error, which cannot be harmless. We do not agree that the conviction on the certificate-of-title counts was substantially affected by the admission of the I–9 evidence.

■■ An error in the admission of evidence that does not implicate constitutional rights is harmless if there is no reasonable possibility that it substantially influenced the jury's verdict. *State v. Valtierra,* 718 N.W.2d 425, 435 (Minn. 2006). A constitutional error is harmless only if it can be said to be harmless beyond a reasonable doubt. *State v. Caulfield,* 722 N.W.2d 304, 314 (Minn.2006). In determining whether this standard has been met, the court looks to "the manner in which the evidence was presented, whether it was highly persuasive, whether it was used in closing argument, and whether it was effectively countered by the defendant." *Id.* (quotation omitted).

■ The state proved the simple-forgery count by presenting evidence tending to show that the photograph on the Minnesota identification card was that of Reynua, but the card was issued in the name of "Laura Romero." Reynua's sister testified that the photograph was of Reynua, the district court found that the photograph was of the same person as the person in the Reynua family photographs, and the court took judicial notice that the person in

all the photographs was the same person that appeared in court to answer the complaint. Although the Minnesota identification card in the name of "Laura Romero" was presented with the I–9 form, the state's proof of the falsity of the identification card did not rely on its use in support of the I–9 form. The falsity of the identification card was shown primarily by the evidence establishing that the person whose photograph was shown on the card was Reynua, not Romero. Although the writing on the I–9 form as well as the signature established that the applicant represented herself to be Laura Romero, the same false representation was shown by the identification card itself, as well as by the circumstantial evidence that the person who applied to Hormel as "Laura Romero" failed to return to work after the police search of the Reynua residence.

■■■ As to the certificate-of-title counts, there was no testimony identifying Reynua as the person who applied for the title certificates to the 1994 Jeep and 1999 Oldsmobile in the name of "Laura Romero." The district court, however, reasoned as follows in finding Reynua guilty:

> The signatures appear to be identical. The standard procedures for transfer of title require a verification of Minnesota ID, and the Minnesota ID number is identical to that submitted in prior evidence. Also, the ID signature, the signature on the documents from the Minnesota Department of Motor Vehicles, and the signature on the [I–9] applications all appear to be the same signature.

Thus, in finding Reynua guilty, the district court relied on (1) identity of signatures; (2) use of the Minnesota identification card number on the certificate-of-title forms; and (3) the fact that Reynua used the "Laura Romero" identity in other circumstances, including obtaining the Minnesota identification card and applying at Hormel, including filling out the I–9 form. It is apparent that the district court considered the I–9 form only as providing corroborative evidence regarding the identity of the signatures. We conclude beyond a reasonable doubt that the admission of the I–9 form did not impact the finding of guilt on the certificate-of-title counts so as to cause reversible error.

### Sufficiency of evidence

Reynua argues that the evidence was insufficient to prove that she was the person who applied for the certificates of motor vehicle title under the name of "Laura Romero."

The state was required to prove that Reynua, acting with fraudulent intent, "use[d] a false or fictitious name" in applying for a certificate of title or "submit[ed] a false, forged, or fictitious document" in support of the application. Minn.Stat. § 168A.30, subd. 1.

■■■ In reviewing the sufficiency of the evidence, the appellate court views the evidence in the light most favorable to the verdict to determine whether it is sufficient to permit the fact-finder reasonably to conclude that the defendant was guilty beyond a reasonable doubt. *Davis v. State*, 595 N.W.2d 520, 525 (Minn.1999). This court will not reverse a conviction if the fact finder, acting with due regard for the presumption of innocence and the reasonable-doubt standard, could reasonably conclude that guilt was proven. *Bernhardt v. State*, 684 N.W.2d 465, 476–77 (Minn.2004).

■■■ As discussed above, there was no testimony identifying Reynua as the person who applied for the certificates of title to the two vehicles in the name of "Laura Romero." Therefore, the state's case relies on circumstantial evidence, and closer

scrutiny of the sufficiency of the evidence is required. *See State v. Andersen,* 784 N.W.2d 320, 329–30 (Minn.2010). The first step in this review involves identifying the circumstances proved, recognizing the jury's prerogative to weigh the credibility of the evidence. *See id.* at 329. The second step is to "examine independently the reasonableness of all inferences that might be drawn from the circumstances proved," including inferences supporting a hypothesis other than guilt. *Id.* (quotation omitted). At this stage, the appellate court gives no deference to the fact finder's choice between reasonable inferences. *Id.* at 329–30.

The state presented the two certificate-of-title applications and the testimony of the deputy registrar in charge of the Austin office. The applications are in the name of "Laura Romero," with a signature the district court found to be identical to the signature on the "Laura Romero" Minnesota identification card, and with the same identification number as is on the "Laura Romero" identification card. There is no photograph of the applicant, and the registrar, who did not handle the applications, could not identify the person who applied for the title certificates. The state's theory, however, was that because Reynua possessed the "Laura Romero" Minnesota identification card in 2009, Reynua's photograph was on the card, and the applicant presented the card in applying for the certificates of title, it was also Reynua who applied for the title certificates in 2007 and 2008 in the name of "Laura Romero."

There were a number of Reynua family members living in the same house and allegedly using false identifications. And the state presented no evidence that Reynua bought the Jeep or the Oldsmobile, that she knew the sellers listed as the immediate past owners, or that she drove either of the vehicles. The district court, howev-

er, reasoned that because the signatures on the certificates were identical to that on the identification card, the identification card with Reynua's photograph was presented by the applicant for the certificates, and it was standard procedure to require a Minnesota identification card, or other proof of identity of the applicant, the state had proven that Reynua was the applicant.

■ Thus, the district court relied on (1) identical signatures; (2) use of the Minnesota identification card number on the certificate-of-title forms; and (3) the fact that Reynua used the "Laura Romero" identity in other circumstances, including obtaining the Minnesota identification card and applying at Hormel, including filling out the I–9 form.

The "Laura Romero" Minnesota identification card with Reynua's photograph was issued in June of 2005, well before the certificate-of-title applications in 2007 and 2008. The "Laura Romero" application to Hormel, supported by the identification card, was submitted in February and March of 2008. The question, therefore, is whether there is a rational hypothesis that a person other than Reynua, the person who obtained the identification card in June 2005, with her photograph on the card, and applied as "Laura Romero" at Hormel in February and March of 2008, applied for the certificates of title using the "Laura Romero" identification card.

The deputy registrar testified that the clerk processing the application would have completed the title-transfer application form for the two vehicles by writing down the identification number from the Minnesota identification card. That identification card bears the photograph of Reynua. It is not a rational hypothesis to infer that someone other than Reynua—even one of her sisters—would have presented the identification card with Reynua's photograph, when the clerk could

**484**

easily have noticed that she was not the person in the photo.

Reynua points to testimony indicating that a number of people around the country could have used the "Laura Romero" identity at about the same time. But the person applying at the Austin deputy registrar's office had to appear in person with an identification card bearing Reynua's photograph. It is not a reasonable inference that a person other than Reynua did so.

### DECISION

Use of the false Minnesota identification card did not constitute aggravated forgery, and, therefore, the conviction on Count 1 must be reversed. Federal immigration statutes preempt the state charge of perjury based on the I–9 employment-eligibility verification form, and, therefore, the conviction on Count 3 must be reversed. But the evidence is sufficient to support the convictions on Counts 4 and 5, fraudulent certificates of title; and admission into evidence of the I–9 form was harmless error as to those counts, as well as to Count 6, simple forgery. Accordingly, we remand for vacation of the Count 1 and Count 3 convictions, and for adjudication of a conviction and sentencing on Count 6.

**Affirmed in part, reversed in part, and remanded.**