MANSFIELD, Justice
(dissenting).
I respectfully dissent.
The court has established an exemption from generally applicable Iowa law for the exclusive benefit of unauthorized aliens seeking employment in our state. Under the majority’s ruling, an American citizen who works in Iowa under a false name because she is being chased by a bill collector and wants to avoid garnishment can be prosecuted, but a foreign national who works in Iowa under a false name to avoid detection is immune. That is the wrong reading of federal preemption.
The correct reading comes from the district court, which denied Martha Martinez’s motion to dismiss and provided the following straightforward explanation:
[Ijdentify theft and forgery are state crimes independént of the Defendant’s immigration status. In this prosecution, the State takes no action to enforce or attack [the Immigration Reform and Control Act], The State’s sole interest is the protection of citizens from identity theft and to protect employers from persons who apply for employment under false names and forge signatures of the names of persons whose identities they have stolen.
I agree with the district court’s reasoning and would affirm.
Although the majority tries to justify its decision based on field preemption and conflict preemption, neither doctrine can sustain its ruling. In the critical part of the majority opinion (i.e., the end of it where the actual legal analysis occurs), my colleagues quote cases out of context and paraphrase cases as saying things they don’t actually say.
Let me give one example from field preemption and another from conflict preemption. The majority today concludes that Congress .has occupied the field of *762 employment of unauthorized aliens, thus precluding the states from enforcing their generally applicable laws, such as identity theft, I am unaware of any other court that has so held. From reading Part II.E.2 of the court’s opinion, though, one might get the impression that Georgia Latino Alliance for Human Rights v. Governor of Georgia, 691 F.3d 1250 (11th Cir. 2012), found field preemption as to employment of unauthorized aliens and therefore supports today’s decision.
One would be wrong. Georgia Latino actually found that Congress had occupied the field of unlawful transport and movement of aliens—not employment. Ga. Latino, 691 F.3d at 1264. That’s a big difference.
Turning to conflict preemption, in Part II.E.3 the court cites and relies upon United States v. South Carolina, 720 F.3d 518 (4th Cir. 2013). The court asserts that this case holds “it is the prerogative of federal officials to police work authorization fraud by aliens.” But South Carolina says no such thing. The state-law crime there involved displaying or possessing false documents “for the purpose of proving lawful presence in the United States.” Id. at 532. Presence in the United States, naturally, is a particular concern of the government of the United States. That isn’t what this case is about. It is about using a false Iowa identification card to obtain employment from an Iowa employer.
To put today’s decision into context, it is helpful to compare it to a recent decision of the United States Court of Appeals for the Ninth Circuit. Recently, the Ninth Circuit held that Arizona’s policy of denying drivers’ licenses to all persons protected by the Obama Administration’s Deferred Action for Childhood Arrivals (DACA) program was preempted by federal law. See Ariz. Dream Act Coal. v. Brewer, 818 F.3d 901, 917 (9th Cir. 2016), amended by 855 F.3d 957 (9th Cir. 2017), petition for cert. filed, 85 U.S.L.W. 3471 (U.S. Mar. 29, 2017) (No. 16-1180). This has sparked disagreement. Dissenting from the denial of rehearing en banc, six judges of that court noted that DACA had not been approved by Congress but was just the President’s “commitment not to deport.” Ariz. Dream Act Coal., 855 F.3d at 958 (Kozinski, J., dissenting from the denial of rehearing en banc). They asked, “Does the Supremacy Clause nevertheless force Arizona to issue drivers’ licenses to the recipients of the President’s largesse?” Id. They characterized the Ninth Circuit panel opinion as relying on a “puzzling new preemption theory.” Id.
Today’s decision goes much farther than that “puzzling” Ninth Circuit decision. Instead of giving the benefits of preemption to people whom the Obama Administration affirmatively exercised its discretion to protect, as the Ninth Circuit did in Arizona Dream Act Coalition, the court today gives the benefits of preemption to someone on whose behalf the Obama Administration declined to exercise its discretion— namely, a person who has committed identity fraud and forgery.
In order to be eligible for deferred status under DACA, an individual must not have been convicted of any felony offense (or misdemeanor punishable by more than one year in prison) in the United States. See Memorandum from Janet Napolitano, Sec’y of U.S. Dep’t of Homeland Sec. to David L. Aguilar, Acting Comm’r, U.S. Customs & Border Prot.; Alejandro May-orkas, Dir., U.S. Citizenship & Immigration Servs.; and John Morton, Dir., U.S. Immigration & Customs Enft (June 15, 2012), http://www.dhs.gOv/xlibrary/assets/s 1-exercising-prosecutorial-diseretion-individuals-who-came-to-us-as-children.pdf. According to the Department of Homeland Security’s website, any conviction under *763 federal, state, or local law qualifies, and only “[i]mmigration-related offenses” are excluded. See U.S. Citizenship & Immigration Servs., Dep’t of Homeland Sec., DACA Toolkit, p. 23-24, https://www.usds. gov/sites/default/files/USCIS/ Humanitarian/Deferred% 20Action% 20for% 20Childhood% 20Arrivals/DACA-toolkit.pdf (last visited June 2, 2017).
Thus, under DACA, state-law convictions for identity theft or forgery are disqualifying. Yet if the Department of Homeland Security did not believe state-law identity theft or forgery charges should prevent an unauthorized alien who arrived as a child from remaining in this country, it could have easily so provided in DACA. It did not. The court thus constructs a preemption theory today on behalf of someone whom the federal executive branch exercised its discretion to decline to protect.
Let me make the same point a different way. Since “federal discretion” appears to be the core basis for the court’s preemption decision, one would expect the court to cite some statement, from some federal official, in some administration expressing the view that states should not prosecute identity theft and forgery by unauthorized aliens seeking employment. That might demonstrate that Iowa was doing something at odds with federal law enforcement. But the court cites no such statement.
Simply stated, the majority’s approach is not preemption under any cognizable legal doctrine. It is not field preemption. It is not conflict preemption. It is, at best, gestalt preemption.[3]
I. Today’s Decision Is Contrary to Precedent, Including Decisions of the United States Court of Appeals for the Ninth Circuit and Appellate Courts in Kansas and Missouri.
Five years ago, in Arizona v. United States, the Supreme Court found that several provisions of a recently enacted Arizona law (S.B. 1070) were preempted by federal immigration law. See 567 U.S. 387, 415, 132 S.Ct. 2492, 2510, 183 L.Ed.2d 351 (2012). The stated purpose of S.B. 1070 was to “discourage and deter the unlawful entry and presence of aliens and economic activity by persons unlawfully present in the United States.” Id. at 393, 132 S.Ct. at 2497 (quoting note following Ariz. Rev. Stat. Ann. § 11-1051 (West 2012)). Two of the four challenged provisions of S.B. 1070 warrant discussion here. Section 3 set forth a new state law misdemeanor consisting of the “willful failure to complete or carry an alien registration document ... in violation of 8 United States Code § 1304(e) or 1306(a).” Id. at 400, 132 S.Ct. at 2501 (quoting Ariz. Rev. Stat. Ann. § 11-1509(A) (West Supp. 2011)). Section 5(C) made it a state law misdemeanor for “an unauthorized alien to knowingly apply for work, solicit work in a public place or perform work as an employee or independent contractor” in Arizona. Id. at 403, 132 S.Ct. at 2503 (quoting Ariz. Rev. Stat. Ann. § 13-2928(C)).
The Court found that section 3 was subject to field preemption. Id. at 403, 132 S.Ct. at 2503. The Court noted that federal law related to alien registration provided a “full set of standards” and was designed as a “harmonious whole.” Id. at 401, 132 S.Ct. at 2502 (quoting Hines v. Davidowitz, 312 *764 U.S. 52, 72, 61 S.Ct. 399, 407, 85 L.Ed. 581 (1941)). The federal framework also included criminal punishment for noncompliance. See 8 U.S.C. §§ 1304(e), 1306(a) (2012). Accordingly, the Court determined the federal government had completely “occupied the field of alien registration.” Id. at 401, 132 S.Ct. at 2502.
The Court continued, “Where Congress occupies an entire field, as it has in the field of alien registration, even complementary state regulation is impermissible.” Id. Thus, even though Section 3 only criminalized activity that was already a federal crime, the federal government’s occupation of the field of alien registration meant that Arizona “may not enter, in any respect,” that field. Id. at 402, 132 S.Ct. at 2502 (“Field preemption reflects a congressional decision to foreclose any state regulation in the area, even if it is parallel to federal standards.”).[4]
As to section 5(C) of S.B. 1070, the federal government argued conflict preemption, and the Court agreed. Id. at 403, 407, 132 S.Ct. at 2503, 2505. As the Court explained, persons who violate provisions of the Immigration Reform and Control Act of 1986 (IRCA) by engaging in unauthorized employment are subject to civil penalties, such as losing their eligibility to have permanent status adjusted, or being removed from the country. Id. at 404-05, 132 S.Ct. at 2504 (discussing 8 U.S.C. §§ 1255(c), 1227(a)(1)). However, the IRCA does not “impose federal criminal sanctions on the employee side.” Id. In the Court’s view, Congress made a “deliberate choice” not to impose criminal penalties on persons who merely seek or engage in unauthorized employment. Id. “Although § 5(C) attempts to achieve one of the same goals as federal law—the deterrence of unlawful employment—it involves a conflict in the method of enforcement.” Id. at 406, 132 S.Ct. at 2505.
The Court therefore determined that section 5(C) “interfere[s] with the careful balance struck by Congress with respect to unauthorized employment of aliens.” Id. The Court found that section 5(C) was preempted by federal law because it was “inconsistent with federal policy and objectives” and “an obstacle to the regulatory system Congress chose.” Id. at 405-06, 132 S.Ct. at 2504-05.
Our case involves neither of the two situations identified in Arizona. The State is not attempting to prosecute either (1) a failure to comply with alien registration or (2) a mere attempt by an unauthorized alien to secure employment. The present case involves, rather, the use of a false Iowa identification to obtain the benefit of employment in Iowa.[5]
Since Arizona was decided, three reported appellate cases, one federal and two state, have addressed our situation. None of them agrees with today’s ruling.
*765 In Puente Arizona v. Arpaio, the plaintiffs mounted a facial challenge to two Arizona identity theft laws as preempted by the IRCA. See 821 F.3d 1098, 1102 (9th Cir. 2016). The first statute prohibited “using the information of another (real or fictitious) person “with the intent to obtain employment.’ ” Id. (quoting Ariz. Rev. Stat. § 13-2009). The second statute was an expansion on the general identity theft statute, enacted in order to “also reach employment-related identity theft.” Id. The Ninth Circuit applied a. presumption against preemption, reasoning that “while the identity theft laws certainly have effects in the area of immigration, the text of the laws regulate for the health and safety of the people of Arizona.” Id. at 1104.
The Ninth Circuit thus concluded that neither statute was field or conflict preempted on its face by the IRCA. Id. In so holding, the court emphasized that “the identity theft laws are textually neutral— that is, they apply to unauthorized aliens, authorized aliens, and U.S. citizens alike.” Id. at 1105. In other words, “one could not tell that the identity theft laws undermine federal immigration policy by looking at the text itself.” Id. Because the statutes at issue “make it a crime for ‘any person’ to use a false document to gain employment,” the court said that cases like Arizona are “easily distinguishable” and “do not control here.” Id. at 1107 (emphasis added).
As a result, the court instead focused on the effect of the statutes to determine “if the state encroached on an area Congress intended to reserve.” Id. at 1106. Considering the statutes were generally applicable to any person who uses another’s identity for any reason—immigration or nonimmi-gration—the court reasoned,
Congress could not have intended to preempt the state from sanctioning crimes that protect citizens of the state under Arizona’s traditional police powers without intruding on federal immigration policy. Thus, we hold that despite the state legislative history, Congress did not intend to preempt state criminal statutes like the identity theft laws.
Id. The court emphasized that this was not a case where “the statutory language singles out unauthorized aliens.” Id. at 1107.
After the Ninth Circuit weighed in and rejected the facial challenge, the Puente Arizona litigation continued in district court. On November 22, 2016, in ruling on cross-motions for summary judgment, the district court held that Arizona’s laws criminalizing identity theft for purposes of obtaining employment were not preempted as applied for the most part. Puente Ariz. v. Arpaio, No. CV-14-01356-PHX-DGC, 2016 WL 6873294, at *10-11, *16 (D. Ariz. Nov. 22, 2016). The court excepted only the approximately 10 percent of cases where the state had used the Form 1-9 and attached documents to investigate or prosecute the case. See id. at *12-13.[6]
Last year, in State v. Ochoa-Lara, the Kansas Court of Appeals held that a state prosecution of identity theft, based on the unlawful use of another’s social security number to gain employment, was not preempted by the IRCA. 52 Kan.App.2d 86, 362 P.3d 606, 612 (2016), review granted (Oct. 21, 2016). The court emphasized that the laws in question were neutrally worded and prohibited using the personal identification of another with the intent to defraud in order to receive a benefit. Id. at 611. The court recognized “Kansas’ historic police power to prosecute identity thieves.” Id. The court concluded that “the possible illegal uses of another’s Social Security number are myriad” and “[tjhere is nothing in the IRCA that suggests that *766 Congress intended the comprehensive preemption of the police powers of the State to prosecute all such instances of identity theft.” Id. at 612.
Likewise, in State v. Diaz-Rey, the Missouri Court of Appeals rejected a preemption defense to a forgery charge based on the use of a false social security card to obtain employment. 397 S.W.3d 5, 10 (Mo. Ct. App. 2013). In finding the law not subject to field preemption, the court reasoned that it was
a state law of general applicability that uniformly applies to all persons as members of the general public, and makes no distinction between aliens and non-aliens. As a general matter, such laws are not preempted simply because a class of persons subject to federal regulation may be affected.
Id. at 9. The court also concluded that conflict preemption did not apply because
[ujnlike section 5(C) of the Arizona statute, section 570.090 does not criminalize activity that Congress has decided not to criminalize. Rather, as charged in this case, it criminalizes the use of inauthentic writings or items as genuine with knowledge and intent to defraud. Thus, section 570.090 does not stand as an obstacle to Congress’s purpose in enacting IRCA.
Id. at 10 (citation omitted).
In this case, the State charged Martinez with forgery and identity theft in violation of Iowa Code sections 715A.2(1)(c) and 715A.8(2) (2013). Both charges stemmed from Martinez’s use of Diana Castaneda’s identity to work at Packers Sanitation. Because Martinez had used the Castaneda documents to secure employment, the forgery charge was elevated to a class “D” felony. See id. § 715A.2(2)(a)(4). Furthermore, the identity theft charge was treated as a class “D” felony because earnings statements from Packers Sanitation indicated Martinez had been paid more than $1000 from January to June 2013. See id. § 715A.8(3).
Like the statutes at issue in the Kansas and Missouri cases,' both misdemeanor forgery under Iowa Code section 715A.2 and identity theft under Iowa Code section 715A.8 are broad-based, neutral laws. They cover certain categories of fraudulent conduct and operate in an area of traditional state police power. For example, the earliest Iowa Codes would have criminalized the conduct that Martinez was alleged to have engaged in here. See Iowa Code § 2627 (1851) (relating to uttering forged instruments).
Notably, our nation has no federal identity card. Driver’s licenses and nonoperator identification cards are an area of traditional state concern. See Koterba v. Commonwealth, 736 A.2d 761, 765 (Pa. Commw. Ct. 1999) (“[T]he issuance [and denial] of driver’s licenses is a function traditionally exercised by the individual state governments.” (Second alteration in original.)). Iowa has a legitimate state interest in the integrity of its own state-issued forms of identification and avoiding their misuse. There is no indication in the IRCA or elsewhere that state prosecutions for use of false state identity documents would undermine a congressional objective such that persons who use those documents to obtain work should receive a “hands off’ from state criminal law.
II. Express Preemption Based on 8 U.S.C. § 1324a(b)(5) Does Not Apply Here.
When Martinez began working at Packers Sanitation, she completed a Form 1-9, titled “Employment Eligibility Verification.” At that time, Martinez provided the Iowa identification card in Diana Castaneda’s name but bearing Martinez’s photo as *767 well as the social security card in Castaneda’s name. Copies of these documents were retained by the employer and obtained by DOT in their investigation. Federal law provides with respect to the 1-9,
Limitation on use of attestation form
A form designated or established by the Attorney General under this subsection [the 1-9] and any information contained in or appended to such form, may not be used for purposes other than for enforcement of this chapter and sections 1001, 1028, 1546, and 1621 of Title 18.
8 U.S.C. § 1324a(b)(5).
This language clearly prohibits a state prosecution based on false statements within the 1-9 form itself. However, two courts have read the language as not foreclosing state prosecutions for the display of false documents when the 1-9 is completed, even if the employer retains copies of the false documents and attaches them to the 1-9. In State v. Reynua, the Minnesota Court of Appeals decided that a state perjury prosecution based on false statements on an 1-9 was preempted but declined to find preemption of a simple-forgery charge due to presentation of a false Minnesota identification card. See 807 N.W.2d 473, 480-81 (Minn. Ct. App. 2011). The court concluded, “[W]e cannot read this provision so broadly as to preempt a state from enforcing its laws relating to its own identification documents.” Id, The court reasoned,
[Section 1324a(b)(5) ] does not exhibit a “clear and manifest purpose” to bar enforcement of state laws pertaining to state identification cards. It would be a significant limitation on state powers to preempt prosecution of state laws prohibiting falsification of state-issued identification cards, let alone to prohibit all use of such cards merely because they are also used to support the federal employment-verification application.
Id. at 481 (quoting Altria Grp., Inc. v. Good, 555 U.S. 70, 77, 129 S.Ct. 538, 543, 172 L.Ed.2d 398 (2008)). In OchoarLara, the Kansas Court of Appeals endorsed this analysis. See 362 P.3d at 610-11.
The United States District Court for the District of Arizona has read the scope of the prohibition more broadly. It found that 8 U.S.C. § 1324a(b)(5) bars investigatory use, not merely evidentiary use, of the 1-9 and attachments in prosecutions other than for the listed federal crimes. Puente Ariz., 2016 WL 6873294, at *12-13. Hence, the court found that the state was “field preempted from using the Form 1-9 and accompanying documents for investigations or prosecutions of violations of the Arizona identity theft and forgery statutes.” Id. at *13. In a subsequent opinion, the court went on to hold that “documents presented solely to comply with the federal employment verification system could [not] be used for state law enforcement purposes” even if “they were not physically attached to a Form 1-9.” Puente Ariz. v. Arpaio, No. CV-14-01356-PHX-DGC, 2017 WL 1133012, at *8 (D. Ariz. Mar. 27, 2017). At the same time, the court concluded that “Congress did not intend to preempt state regulation of fraud outside the federal employment verification process.” Id. at *7. And it concluded that state authorities could use the same documents as the basis for a prosecution “if they were also submitted for a purpose independent of the federal employment verification system, such as to demonstrate ability to drive or as part of a typical employment application.” Id. at *8.
I agree with the views of the Minnesota and Kansas courts. “Use” is an inherently ambiguous term. See Arizona v. Inter Tribal Council of Ariz., Inc., 570 U.S. -, -, 133 S.Ct. 2247, 2254, 186 L.Ed.2d 239 (2013) (describing the verb use as “elastic”). In context, 8 U.S.C. *768 § 1324a(b)(5) establishes an evidentiary bar on the use of 1-9 paperwork other than in certain enumerated federal prosecutions. If Congress had intended the 1-9 and attachments to be totally off-limits to federal and state agencies other than for the listed federal prosecutions it would have worded the statute much differently—i.e., as a limitation on disclosure. For example, given the Arizona federal district court’s interpretation, it would be unlawful for the FBI to obtain an'employee’s 1-9 and attachments from an employer in the course of a terrorism investigation of that employee, because the offenses under consideration were not listed in section 1324a(b)(5). That seems absurd to me.[7]
In Chamber of Commerce of the United States v. Whiting, the Supreme Court indicated that § 1324a(b)(5) does not prohibit an employer from showing that it complied with the 1-9 process to defend against a state criminal prosecution without using “the 1-9 form or its supporting documents themselves.” 563 U.S. 582, 603 n.9, 131 S.Ct. 1968, 1982 n.9, 179 L.Ed.2d 1031 (2011). Similarly, I do not believe § 1324a(b)(5) by its terms prohibits Iowa from prosecuting Martinez for using a false state identification card to obtain employment, so long as it does not rely on the 1-9 paperwork retained by the employer to do so. And in fact, Martinez concedes that “[tjhere probably is not express preemption” in this case based on § 1324a(b)(5). And the court today does not rely on express preemption.
Yet, § 1324a(b)(5) highlights another flaw in the majority’s preemption ruling. The fact that Congress included a narrow and specific preemption clause in that section limited to the 1-9 undermines the majority’s view that Congress actually preempted all prosecutions of unauthorized aliens (but only unauthorized aliens) for using false identities to obtain employment. Why write a narrow preemption clause if the entire field was preempted?[8]
III, Felony Forgery Is Not Preempted Either.
It is easy for me to conclude that federal immigration law does not preempt a prosecution of Martinez for general forgery or identity theft. Felony forgery presents a somewhat closer question, however. Forgery is a class “D” felony “if the writing is or purports to be ... [a] document prescribed by statute, rule, or regulation for entry into or as evidence of authorized stay or employment in the United States.” See Iowa Code § 715A.2(2)(a)(4).
Iowa Code section 715A.2(2)(a)(4) became law in 1996. See 1996 Iowa Acts ch. 1181, § 3. Almost all the changes affected by this legislative package relate to the hiring of unauthorized aliens. See id. § 1-4. Section 1 requires employers who actively recruit non-English speaking residents of other states more than 500 miles away to provide a written statement, signed by the employee, that “possession of forged documentation authorizing the person to stay or be employed in the United States is a class ‘D’ felony.” Id. § 1 (codified at Iowa Code § 91E.3(1)(e) (2013)). Section 2 makes knowing posses *769 sion of a forged document a crime. Id. § 2 (codified at Iowa . Code § 715A.2(1)(d)). Section 3 adds to the list of documents covered by Class D forgery felony “[a] document prescribed by statute, rule, or regulation for entry into or as evidence of authorized stay or employment in the United States.” Id. § 3 (codified at Iowa Code § 715A.2(2)(a)(4)). Section 4 imposes a civil penalty on an employer who knowingly hires an employee who is not authorized to be employed in the United States or whose documentation evidencing authorized stay or employment is known to be false, subject to the safe harbor in Title 8 U.S.C. § 1324a(b). Id. § 4 (codified at Iowa Code § 715A.2A). The preamble to the legislation describes it as
AN ACT relating to the crime of forgery, by prohibiting the knowing possession of forged writings, including documents prescribed for entry into, stay, or employment in the United States, and providing criminal penalties and providing civil penalties for employers hiring individuals with forged documents regarding the individuals’ entry into, [stay], or employment in the United States.
Id The fiscal note for the legislation estimated that the law would result in 1000 new criminal convictions annually in Iowa, on the theory that “approximately 1,000 deportations of persons apprehended in Iowa occur each year and possession of forged documents are applicable to all such deportations.” S.F. 284, 76th G.A., 2d Sess. fiscal note (Iowa 1996).
This case of course involves Section 3 of the 1996 legislation. Section 3 is not a facially neutral law. It was written to address unauthorized immigration, and the law piggybacks verbatim on the following federal language:
Whoever knowingly forges, counterfeits, alters, or falsely makes any ... document prescribed by statute or regulation for. entry into or as evidence of authorized stay or employment in the United •States, or utters, uses, attempts to use, possesses, obtains, accepts, or receives any such ... document prescribed by ■ statute' or regulation for entry into or as evidence of authorized stay or employment in the United States, knowing it to be forged, counterfeited, altered, or falsely made....
18 U.S.C. § 1546(a).
Yet I would conclude that the law does not cross the line set forth in Arizona. Our legislature did not intrude within an exclusively federal domain or criminalize conduct that Congress had opted not to criminalize; instead, it placed a state criminal sanction on top of a federal criminal sanction in an area that states can regulate. Also, the practical applications of the Arizona law upheld in Puente Arizona and the Iowa law are probably similar. Both cover basically the same conduct. Both would apply to an American citizen’s use of forged documents when seeking employment—in addition to an unauthorized alien’s use of such documents.
The majority’s discussion of felony forgery in Part III.Í) rests on additional out-of-context case Quotations. As I’ve already explained at length, Arizona does not bar states from criminalizing conduct that federal immigration law also criminalizes, outside of those areas like alien registration and unlike alien employment where field preemption applies. So Arizona does not help the majority. The majority’s quotations from Valle del Sol Inc. v. Whiting and Georgia Latino are also taken out of context and do not aid the majority’s position. In both instances the laws at issue related to alien harboring and transportation, an area where Congress has fully occupied the field. Valle del Sol Inc. v. Whiting, 732 F.3d 1006, 1012 (9th Cir. *770 2013); Ga. Latino, 691 F.3d at 1256. That consideration, and only that consideration, prevented the states from “layer[ing] additional penalties atop federal law.” Ga. Latino, 691 F.3d at 1267; see also Valle Del Sol Inc., 732 F.3d at 1027. Layering is not generally prohibited, though, and we commonly see parallel state and federal criminal laws covering the same misconduct. In the typical case, both sets of laws are equally enforceable.
IV. Conclusion.
I accept the representations of defense counsel that defendant Martha Martinez was born in Mexico and brought to this country by her parents when she was eleven years old. I accept the further representations that she has lived in this country for the last twenty years, just wants to work here to make ends meet, and would not consider Mexico her home.
But the majority’s ruling will apply to all unauthorized aliens who use a false identity to work in this state, whether they are as sympathetic as Martinez or not. An unauthorized alien who is working under an alias to avoid paying taxes or cover up a criminal history will also reap the benefit of today’s decision. At the same time, an American citizen who is just as sympathetic as Martinez will not benefit from today’s decision. Our job should not be to pick winners or losers but to apply federal law as given to us by Congress and state law as given to us by the general assembly.[9]
I want to close by noting an irony in today’s ruling. According to the majority, federal law preempts criminal fraud committed by an unauthorized alien only where the purpose of the fraud is to obtain work. Hence, while Martinez cannot be prosecuted for using her false Iowa identification to get herself hired by an Iowa employer, she can be prosecuted for using that same false identification to cash her employer’s paycheck at a bank. When a court decision rests on such a diaphanous distinction, that is another reason to question it.
For all the reasons I have stated, I respectfully dissent.
Waterman and Zager, JJ., join this dissent.

. In explaining the court’s theory of preemption, the first special concurrence analogizes this case to “state laws that indirectly interfere with the right to vote.” Such an analogy is off the mark. Citizens have a constitutional right to vote. Unauthorized aliens do not have a constitutional right to work in the United States under a false name.

. The first special concurrence conflates this part of the Supreme Court’s decision with the part dealing with employment of unauthorized aliens. Specifically, to support its claim of field preemption, the first special concurrence provides a block quotation from the Court’s discussion of section 3 of S.B. 1070, urging that this '‘holding ... needs only a few words changed to illustrate the conflict with the preemption doctrine in this case.” But the Arizona language in question relates to alien registration, not alien employment, and thus has nothing to do with the present case. See 567 U.S. at 401, 132 S.Ct. at 2502.

. The first special concurrence relies on Arizona for the proposition that "no state may impose criminal penalties on unauthorized employees.” As I have explained, that is not a holding of the case. Rather, Arizona holds that states may not criminalize the mere act of seeking or holding employment by an unauthorized alien. Id. at 406-09, 132 S.Ct. at 2505-06. The Iowa laws at issue do not do this.

. I discuss the 1-9 exemption below.

. The district court’s latest opinion, in my view, must overcome an additional interpretive obstacle. Section 1324a(b)(5) refers to “information ... appended to such form.” 8 U.S.C. § 1324a(b)(5), If the document has been submitted to the employer but not attached to the 1-9, it has not been “appended to such form,”

. Additionally, the majority’s suggestion that Martinez would not have needed to commit forgery if it hadn’t been for federal law should be rejected. When Martinez went to work at Packers Sanitation, even if the 1-9 requirement never existed, she would have had to give some identity including a social security number for federal and state tax purposes.

. In my view, we also should not be using our opinions as a platform for criticizing a county attorney. I will leave any response to that criticism to the county attorney himself.